766 So.2d 751 (2000)
Juanita FURLOUGH, Judiana Cotton, Denise Grayson, Andrew Furlough, Jr. and Gary Furlough, Plaintiffs-Appellants,
v.
UNION PACIFIC RAILROAD COMPANY, et al., Defendants-Appellees.
No. 33,658-CA.
Court of Appeal of Louisiana, Second Circuit.
August 31, 2000.
Rehearing Denied September 21, 2000.
*754 McKernan Law Firm by Joseph J. McKernan, Baton Rouge, Thomas & Hardy by Elizabeth S. Hardy, Lake Charles, Counsel for Appellants.
Hudson, Potts & Bernstein, L.L.P. by W. Craig Henry, Monroe, Fraser, Morris & Wheeler, L.L.P., by David A. Fraser, Lake Charles, Counsel for Appellee, Union Pacific Railroad Company.
Nanci S. Summersgill, Monroe, Counsel for Appellee, The City of Monroe.
Before STEWART, CARAWAY & PEATROSS, JJ.
PEATROSS, J.
This appeal arises out of an automobile/train accident which occurred at the S. 24th Street railroad crossing in Monroe, Louisiana. On January 6, 1995, a vehicle driven by Andrew Furlough collided with a Union Pacific Railroad Company[1] locomotive. Mr. Furlough died shortly after the collision. His wife and four children[2] brought the present action against UP; John Doyle Watson, the train's engineer; the City of Monroe; and ABC, DEF, and GHI Insurance Companies. At the close of Plaintiffs' case, the trial court granted an involuntary dismissal in favor of the City of Monroe.[3] After a nine-day jury trial, the jury rendered a verdict in favor of Defendants UP and John Doyle Watson (collectively referred to herein as "UP"). Plaintiffs now appeal, assigning ten errors. For the reasons stated herein, we affirm.

FACTS

The Accident
At approximately 8:00 a.m. on January 6, 1995, Mr. Furlough was traveling in a westerly direction at approximately 20 miles per hour on S. 24th Street in Monroe. As he crossed the railroad tracks that intersect S. 24th Street, his Ford Tempo was struck by a train owned by UP.[4] Mr. Furlough was familiar with the crossing, having traversed it numerous times. The train, which consisted of 2 engines and 74 cars loaded with grain, was traveling in a southerly direction at approximately 28 miles per hour.[5] The federal speed limit for this track is 40 miles per hour. The weather conditions were not optimallight rain and cloudy/foggy with low visibility.
The train's engineer, John Doyle Watson, and conductor, Benny Joe Bowman, testified that they did not see Mr. Furlough's vehicle until immediately before impact. The train's brakes, therefore, were not applied, until the moment of impact. At that point, Mr. Furlough's vehicle was knocked clear of the tracks. Mr. Watson testified that, for that reason, he did not immediately apply the train's emergency brakes, but, rather, applied the *755 general locomotive brakes first, followed by the emergency brake. Mr. Watson testified that he applied the brakes in this manner in order to stop the train in the safest way possible. According to Mr. Watson, had he immediately applied the emergency brake, he would have created the risk of derailing the train and possibly causing multiple accidents.
The train was equipped with an event recorder on the lead engine. Several witnesses testified for the various parties regarding analysis and interpretation of the event recorder data including when the different brake systems were applied and whether the horn was properly sounded. Likewise, the record reveals conflicting testimony from the train crew and eye witnesses as to whether the horn was sounded in accordance with La. R.S. 32:168, which requires that the horn be sounded at least one quarter of a mile, or 1320 feet, from the crossing. Additionally, the train was equipped with ditch lights[6], which were not working at the time of the collision.

The Crossing
At the time of the collision, the crossing was marked with a circular yellow and black advance warning sign, white pavement markings and the standard reflectorized railroad cross buck sign. The parties do not dispute that the signage at the crossing was in compliance with the Manual of Uniform Traffic Control Devices ("MUTCD"). According to Plaintiffs, however, several hazards existed at the crossing, including parallel roadways, the uneven pavement at the crossing and sight obstructions in the form of buildings adjacent to the crossing and vegetation. Regarding the sight obstructions, at 180 feet from the crossing, Mr. Furlough could see 24 feet down the tracklooking north, the direction from which the train was approaching. Additionally, there have been six previous accidents at this crossing between 1976 and 1995, the most recent one from the time of this collision was in 1987.

PROCEDURAL BACKGROUND
In October 1997, the trial court issued a pretrial order setting the date by which all dispositive motions must be filed by the parties; all such motions were to be filed by March 16, 1998. These motions were to be heard by the trial court on March 31, 1998; and the trial was scheduled to commence on August 24, 1998. On March 16, UP filed a motion for partial summary judgment and, alternatively, a motion in limine raising the issue of federal preemption[7] of Plaintiffs' claims of *756 inadequate warning devices at the crossing and excessive train speed. Plaintiffs also filed a motion for partial summary judgment seeking a ruling that UP had breached its duty of ordinary care by failing to provide a safe crossing or taking additional safety measures at the crossing due to its extra-hazardous nature. On August 10, 1998, the trial court, in a written order, denied all parties' motions for summary judgment. The order did not address UP's alternative motion in limine regarding the exclusion of evidence concerning adequacy of warning devices or excessive speed. On August 20, 1998, UP filed additional motions in limine setting forth 21 areas of evidence it sought to exclude, including evidence pertaining to the issues of federal preemption of the adequacy of warning devices and excessive train speed, which had been raised in UP's previous motion for partial summary judgment and alternative motion in limine. Additionally, in the August 20th motion in limine, UP asserted the federal preemption of, and sought to exclude evidence of, Plaintiffs' claims concerning obstructive vegetation; defective equipment (ditch lights); failure to warn by virtue of the inoperative equipment; and audibility of the train's whistle. The City of Monroe also filed a motion in limine on August 20, 1998; and Plaintiffs filed a motion in limine on August 24, 1998, the first day of trial.
The trial court ultimately granted UP's motion in limine regarding the adequacy of warning devices, excessive train speed and inoperative ditch lights, finding that such issues were preempted by federal law. The trial court denied UP's motion in limine regarding preemption of obstructive vegetation and audibility of the train's whistle. Much of Plaintiffs' argument on appeal concerns the propriety of the trial court's consideration of these motions filed by UP since the affirmative defense of preemption was not pled in UP's answer and the fact that the motion was filed one working day prior to trial. Additionally, Plaintiffs challenge the substantive rulings involving the application of federal preemption. We will address the assignments of error dealing with UP first, beginning with a discussion of the procedural aspect of Plaintiffs' argument, followed by a discussion of the substantive issue of federal preemption (this discussion includes Plaintiffs' assignments of error numbers one through four). Plaintiffs' remaining assignments will then be addressed in order of assignment, with the exception of assignment of error number six which concerns the granting of an involuntary dismissal in favor of the City of Monroethis assignment will be discussed last.

DISCUSSION

Consideration of UP's motion in limine filed on August 20, 1998
Plaintiffs contend that the issue of federal preemption is an affirmative defense which should have been raised in UP's answer. According to Plaintiffs, motions in limine concerning affirmative defenses should only be granted as the result of a previous ruling by the trial court on the affirmative defenses. Since the only issue of preemption raised in UP's answer concerned the adequacy of warning devices, Plaintiffs assert that the trial court's consideration of, and ruling on, the subsequent motions in limine was error. We find no merit to Plaintiffs' argument.
We agree that federal preemption is an affirmative defense, which, under La. C.C.P. arts. 1003 and 1005, should be pled in a defendant's answer. Cooper v. Borden, 30,292 (La.App.2d Cir.2/25/98), 709 So.2d 878. Failure to so plead an affirmative defense, however, does not automatically preclude the application of the defense in all cases. For example, La. C.C.P. art. 1154 provides that pleadings may be enlarged by evidence adduced without objection, even if such evidence concerns an affirmative defense not pled in *757 the answer. Cooper, supra. The purpose of the pleading requirement for affirmative defenses is to provide plaintiffs with adequate notice of the nature of any defenses. Cooper, supra. In Cooper, the defense of federal preemption was raised for the first time on appeal. Refusing to find that the pleadings had been enlarged to include such affirmative defense, a panel of this court stated that "[a]t no time during the trial or in any pleading did Borden argue that it was immune from liability." The case sub judice stands in marked contrast to cases such as Cooper, wherein the plaintiff has had no indication that a defendant planned to raise a certain affirmative defense. Indeed, UP raised the issue of federal preemption by motions as early as March 16, 1998, more than five months prior to trial. Plaintiffs vigorously defended against the various motions asserting federal preemption prior to trial, and at no time did they voice an objection to UP's raising the issue of federal preemption by way of motion rather than in its answer. We find that Plaintiffs had more than adequate notice well before trail that UP claimed immunity by virtue of federal preemption and that Plaintiffs' failure to object thereto constituted a waiver of any such objection.
Next, Plaintiffs assert that it was error for the trial court to consider the motion in limine filed by UP on August 20th because it was substantive in nature, concerning virtually the same issues raised in the previous motion for partial summary judgment, which was denied by the trial court. Plaintiffs also object on the ground that the August 20th motion in limine was filed only one working day prior to commencement of the trial. Again, we find no error in the trial court's consideration of UP's motion. Motions in limine provide both plaintiffs and defendants with a vehicle to have evidentiary issues decided prior to trial. Such motions are not governed by any particular rules on timing or substance and no deadline was set for the filing of such motions in this case. In fact, Plaintiffs filed a motion in limine on the day trial began. The trial court has great discretion in its consideration of motions in limine; and we find no abuse of that discretion in its entertaining the motion filed by UP on August 20, 1998. This argument is without merit. We turn now to the substantive issues of whether the trial court erred in finding federal preemption in the areas of adequacy of warning devices, excessive train speed and inoperative ditch lights.

Preemption of adequacy of warning devices
The parties devote considerable argument to whether the adequacy of warning devices in this case is preempted by federal law, specifically by 23 C.F.R. § 646.214(b)(3) and (4), which are regulations designed by the Secretary of Transportation, through the Federal Highway Administration ("FHWA"), implementing the Federal Railway-Highway Crossings Program. See 23 U.S.C. § 130. Specifically, these sections address the adequacy of warning devices installed under the program. Section (b)(3) provides that "[a]dequate warning devices ... on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals" if any of the following conditions are present: (A) multiple main line railroad tracks; (B) multiple tracks in the vicinity such that one train might "obscure the movement of another train approaching the crossing"; (C) high speed trains combined with limited sight distances; (D) a "combination of high speeds and moderately high volumes of highway and railroad traffic"; (E) the use of the crossing by "substantial numbers of school buses or trucks carrying hazardous materials"; or (F) when a "diagnostic team recommends them." Section (b)(4) states that "[f]or crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, *758 and/or the railroad, is subject to the approval of FHWA."
Much of the debate over the preemptive effect of the above regulations centers around the United States Supreme Court's decision in CSX Transportation, Inc., v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), wherein the Supreme Court held that, because §§ 646.214(b)(3) and (4) "establish requirements as to the installation of particular warning devices ... when they are applicable, state tort law is preempted." In the case sub judice, Plaintiffs advance two arguments in support of their position that the adequacy of the warning devices at the S. 24th Street crossing is not preempted under the federal regulations or their interpretation in Easterwood. First, Plaintiffs argue that Project XXX-XX-XXXX, under which the warning signs at the S. 24th Street Crossing were installed, arose under the "minimum protection" program of the federal government, rather than the "hazard program." The minimum protection program provides only for minimum signage at railroad crossings while, under the hazard program, States submit requests for federal funds to improve the warning devices or signage at crossings pursuant to a study conducted by a diagnostic team that determines the particular warning devices to be installed. The key to Plaintiffs' argument in this regard is that, in identifying the crossings in need of signage under the minimum protection program, no analysis or review by the hazard program's diagnostic team is conducted; therefore, there is no preemption. Additionally, Plaintiffs contend that the S. 24th Street crossing presented several of the factors in § 646.214(b)(3), but was not equipped with flashing lights or gates; therefore, there is no preemption of Plaintiffs' claim.
In April of this year, while this case was pending on appeal, the Supreme Court handed down its decision in Norfolk Southern Railway Company v. Shanklin, 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000), which resolves the precise issue presented in this case. Faced with arguments identical to Plaintiffs' arguments in our case, the Supreme Court held that whether or not preemption lies is not determined by the type of program under which the devices are installed:
This construction ... contradicts the regulation's plain text. Sections 646.214(b)(3) and (4) make no distinction between devices installed for "minimum protection" and those installed under a so-called "hazard" program. Nor does their applicability depend on any individualized determination of adequacy by a diagnostic team or an FHWA official. Rather, as the FHWA itself explained in its Easterwood brief, §§ 646.214(b)(3) and (4) have a "comprehensive scope." Section 646.214(b)(3) states that its requirements apply to "any project where Federal-aid funds participate in the installation of the devices." And § 646.214(b)(4) applies to all federally funded crossings that do not meet the criteria specified in (b)(3). Either way, the federal standard for adequacy applies to the crossing improvement and "substantially subsume[s] the subject matter of the relevant state law." (Internal citations omitted.)
Regarding the petitioner's contention that the crossing in Shanklin presented (b)(3) factors and, therefore, preemption should not lie, the Supreme Court explained:
This misconceives how preemption operates under these circumstances. When the FHWA approves a crossing improvement project and the State installs the warning devices using federal funds, §§ 646.214(b)(3) and (4) establish a federal standard for the adequacy of those devices that displaces state tort law addressing the same subject. At that point, the regulation dictates "the devices to be installed and the means by which railroads are to participate in their selection." It is this displacement of state law concerning the devices' adequacy, *759 and not the State's or the FHWA's adherence to the standard set out in §§ 646.214(b)(3) and (4) or to the requirements of the MUTCD, that preempts state tort actions. Whether the State should have originally installed different or additional devices, or whether conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate, is immaterial to the preemption question. (Internal citations omitted.)
Applying the law as pronounced in Shanklin, we find that, because federal funds were utilized to install the warning signs at the S. 24th Street crossing, §§ 646.214(b)(3) and (4) governed the selection of those devices. Since the State "determined that warning devices other than automatic gates and flashing lights were appropriate, its decision was subject to the approval of the FHWA," and "[o]nce the FHWA approved the project and the warning signs were installed with federal funds, the federal standard for adequacy displaced [Louisiana law] addressing the same subject, thereby preempting [Plaintiffs'] claim." Shanklin, supra. We conclude, therefore, that the trial court's granting of UP's motion in limine regarding Plaintiffs' claim of inadequate warning devices was proper.

Preemption of excessive train speed
Federal regulation 49 C.F.R. § 213.9(a) sets the maximum allowable operating speeds for all freight and passenger trains for various classes of track on which they travel. The different classes of track are defined by, inter alia, their gage, alignment, curvature, surface uniformity and the number of crossties per length of track. See §§ 213.51-213.143; Easterwood, supra. The S. 24th Street crossing is a class three, for which the maximum allowable speed is 40 miles per hour. The train in this case was traveling well within the allowable speed limit set by the federal regulations. In Easterwood, supra, the Supreme Court stated, "the Secretary's regulations focus in providing appropriate warnings given variations in train speeds" and that such regulations "must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner." More specifically, in Easterwood, the Supreme Court first examined the preemptive clause found in the Federal Railroad Safety Act ("FRSA") which provides that federal regulations preempt those of a state unless the state necessarily adopts more stringent regulations to eliminate a local safety hazard.[8] The Court then recognized that 49 C.F.R. § 213.9 provides the maximum speeds for trains and found that "§ 213.9(a) should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." Easterwood, supra. Our reading of Easterwood, and its progeny, reveals the Supreme Court's unquestionable intention to hold that any claim in state tort law based on excessive train speed is displaced, or preempted, by the *760 federal regulations. See also St. Louis Southwestern Railway Co. v. Pierce, 68 F.3d 276 (8th Cir.1995); Watson v. Rail Link, Inc., 826 F.Supp. 487 (S.D.Ga.1993); Barlett By and Through Barlett v. Kansas City Southern Railway Co., 854 S.W.2d 396 (Mo.1993); Armstrong v. Atchison, Topeka & Santa Fe Railway Co., 844 F.Supp. 1152 (W.D.Tex.1994); Michael v. Norfolk Southern Railway Company, 74 F.3d 271 (11th Cir.1996); Cart v. Missouri Pacific R.R. Co., 99-1118 (La.App. 3d Cir.12/8/99), 752 So.2d 241, writ denied, XXXX-XXXX (La.4/7/00), 759 So.2d 767; Western Company of North America v. Dynasty Transportation, Inc., 96-877 (La. App. 3d Cir.5/7/97), 696 So.2d 1.
Plaintiffs make a similar argument regarding train speed as with the adequacy of warning devices, i.e., that, because there was no individual analysis of the crossing by a "diagnostic team," the federal regulation does not "cover" and, therefore, does not preempt, a state tort law claim. For the same reasons discussed above and in Shanklin, supra, we find this argument to be without merit.[9]
Alternatively, Plaintiffs contend that, even if the federal regulations regarding train speed "cover" their state law claim, since the crossing in question constitutes an "essentially local hazard"[10] or "specific, individual hazard," the issue of the train crew's duty to slow or stop to avoid such hazard is not preempted. Easterwood, supra. Specifically, Plaintiffs claim that the combination of hazards at the S. 24th Street crossing which allegedly existed on January 6, 1995 (i.e., obstructed sight line, rough crossing, parallel roadways, inadequate warning devices, inoperative ditch lights and inclement weather), rose to the level of a "specific, individual hazard." While we acknowledge that the Supreme Court in Easterwood chose not to address the preemptive effect on claims for "breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard," we disagree with Plaintiffs that, on January 6, 1995, the S. 24th Street crossing presented the type of hazard contemplated by courts applying that concept. In Western Company of North America, supra, the third circuit examined the concept of "specific, individual hazard." In finding none to exist in that case, the court explained:
A "specific, individual hazard" cannot be a statewide problem. A "specific, individual hazard" may entail any object that was not contemplated by the federal regulators who promulgated the Federal Railroad Safety Act and its regulations. Examples of such objects include illegally and improperly parked tank cars which obstruct the view of a train engineer who fails to reduce the speed of the train despite the obstructions. Negligence claims which attempt to impose additional regulations on train speed, such as the train should have *761 operated at a slower speed given the conditions posed by the track or the grade crossings, are preempted by the Federal Railroad Safety Act or its regulations.
We are not suggesting that Mr. Zenon cannot discuss the speed of the train whatsoever while arguing his case. If the speed of the train constitutes National Railroad's act of negligence, then that claim is preempted. Mr. Zenon may, however, introduce the speed of the train for illustrative purposes when arguing other issues revolving around the accident. In Lee v. Missouri Pac. R.R. Co., 540 So.2d 287 (La.1989), the Louisiana Supreme Court allowed a discussion of train speed to be used to determine the adequacy of warning signs at train crossings. In this case, train speed is admissible to the extent that Mr. Zenon wishes to present the speed of the train for illustrative purposes for claims other than one which asserts the speed of the train itself constituted an act of negligence. (Internal citations omitted).
In the present case, the majority of the hazards alleged by Plaintiffs are conditions of the crossing which were certainly of the type considered by the Secretary in determining maximum train speeds. Moreover, a sight obstruction in the form of a building adjacent to the tracks, coupled with inclement weather, has been found not to be consistent with a "specific, individual hazard" as contemplated by Easterwood, supra. Williams v. Alabama Great Southern Railroad Co., 1994 WL 419863 (E.D.La.1994). A "specific, individual hazard," rather, concerns the duty of the train crew to avoid an "imminent collision." Id. We, therefore, find Plaintiffs' argument to be without merit. The trial court did not err in granting UP's motion in limine finding federal preemption of Plaintiffs' claim regarding excessive train speed, as it relates to any negligence on the part of the railroad.[11]

Preemption of inoperative ditch lights
The trial court also granted UP's motion in limine finding preemption of Plaintiffs' claim concerning the fact that the ditch lights on the train's engine were not working at 8:00 a.m., the time of the collision, and excluded the testimony of Plaintiffs' expert Jim Scott whose testimony would have established that the operation of the engine with inoperative ditch lights was a violation of 49 C.F.R. § 229.133.[12] We find no error in the trial court's ruling. Federal regulation of locomotive equipment, the Locomotive Boiler Inspection Act, as amended, 49 U.S.C. § 20701, et seq., has been held a total occupation of the field, thereby, preempting all state and local regulation on the same subject. United Transportation Union v. Foster, 205 F.3d 851 (5th Cir.3/17/00). In United Transportation Union, The Fifth Circuit explained:
The Locomotive Boiler Inspection Act (LBIA), as amended, 49 U.S.C. § 20701, et seq., grants the United States the power to regulate all "parts and appurtenances" of railroad locomotives. The question of whether Congress intended the LBIA to preempt state regulation of railroad parts and appurtenances was addressed by the Supreme Court in Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 47 S.Ct. 207, *762 71 L.Ed. 432 (1926) [on remand, 192 Wis. 240, 212 N.W. 425 (1927)], which held that Congress intended the LBIA to "occupy the field" of locomotive equipment regulation. Id. at 613, 47 S.Ct. 207.... In short, the LBIA completely preempts the field of locomotive equipment. See Id.; Missouri Pacific R. Co. v. Railroad Comm'n of Texas, 833 F.2d 570, 576 n. 7 (5th Cir.1987).
Likewise, in Marshall v. Burlington Northern, Inc., 720 F.2d 1149 (9th Cir. 1983), the Ninth Circuit held that the FRSA indicated the intent of Congress "to leave the Boiler Inspection Act intact, including its preemptive effect" and, therefore, found complete preemption of the plaintiff's claim that the locomotive involved in that case should have had strobe or oscillating lights attached to it at the time of the accident, despite the fact that such lights were not required by the Boiler Inspection Act or its regulations. Likewise, at the time of this accident, ditch lights were authorized, but not required, equipment for locomotives. See fn. 12, supra. In any event, the jurisprudence clearly provides that any issue relating to the equipment in place on a locomotive is completely preempted. We find, therefore, that the trial court's ruling finding preemption of the issue of inoperative ditch lights was proper.
Plaintiffs attempt to draw a distinction in this case arguing that the issue at hand is not whether or not ditch lights were installed, but whether the train should have continued in operation once the ditch lights had failed. In this regard, while we find that any issue regarding the operation of the ditch lights is preempted, we also agree with the alternative argument advanced by UP, wherein UP asserts that any error in the exclusion of this evidence was harmless in light of the evidence admitted at trial and the trial court's instructions to the jury. Plaintiffs were allowed to present evidence establishing the purpose of ditch lights, that the ditch lights on the lead engine were not working at the time of the accident, when the lights' failure was discovered and the substance of UP's company policy regarding continued operation of the train once the lights failed. While the trial court did instruct the jury that having inoperative ditch lights was not to be considered a violation of federal law, the trial court also included in its charge to the jury that one of Plaintiffs' claims was UP's operation of the train with non-working ditch lights.[13] As UP points out, the jury was free to consider this evidence in determining liability on the part of UP, either as an independent source of negligence, violation of company policy or otherwise.

Denial of Plaintiffs' motion for summary judgment; granting of UP's motion in limine
In assignment of error number five, Plaintiffs complain that the denial of their motion for summary judgment, "coupled with the erroneous grant of preemption of plaintiffs' claim of inadequate warning devices," prejudiced their right to present relevant evidence of UP's negligent conduct and, therefore, was error. First, we note that an appeal may not be taken from a trial court's denial of a motion for summary judgment. La. C.C.P. Article 968; Magill v. Owen Construction Co., Inc., 434 So.2d 520 (La.App. 2d Cir. 1983). The proper method to seek review of a denial of a motion for summary judgment is to seek supervisory writs, which was not done in this case. See Smith v. Brooks, 96-1085 (La.App. 3d Cir.2/5/97), 689 So.2d 544, appeal after remand, 97-1338 (La.App. 3d Cir.4/15/98), 714 So.2d 735, writ not considered, 98-1869 (La.10/30/98), 723 So.2d 969. Moreover, as previously discussed, we find no error in the trial court's rulings on federal preemption and, therefore, find no merit in this assignment.

*763 Jury instructions

In assignment of error number seven, Plaintiffs argue that the instructions given by the trial court to the jury were confusing and erroneous. Plaintiffs challenge the jury instructions for the first time on appeal. A party may not assign as error, however, the giving of or failure to give instructions unless the party objects thereto, either before the jury retires to consider its verdict or immediately after the jury retires. La. C.C.P. art. 1793(C); Sledge v. Continental Casualty Co., 25,770 (La.App.2d Cir.6/24/94), 639 So.2d 805. By failing to timely object, therefore, Plaintiffs failed to preserve the issue for appeal. Sledge, supra.
Plaintiffs argue, however, that, even if this court finds waiver, we should nonetheless consider this assignment because they had insufficient time to review and form meaningful objections to the instructions. La. C.C.P. art. 1793(B) provides that the trial court shall inform the parties of its proposed action on requested jury instructions and shall also inform the parties of the instructions it intends to give to the jury at the close of evidence within a reasonable time prior to their arguments to the jury. The record reveals that all parties had copies of the preliminary instructions at least one day prior to the jury retiring and the final instructions several hours before objections would have been required. We find this was within a reasonable time prior to their arguments to the jury.
A brief look at this issue, however, clearly reveals that, in light of our ruling regarding federal preemption, there was nothing improper or confusing in the instructions as given. Specifically, Plaintiffs complain of the following instructions:
In this case, I have previously ruled that, as a matter of law, the railroad was not required to place additional or different signs or signals at the South 24th Street crossing. Additionally, I have ruled that, as a matter of law, the railroad was not required to run its trains at any speeds lower than 40 mph on this area of track.
Therefore, if you find fault on the railroad, that finding must be based on some conduct other than signs or signals or train speed.
The federal government set the train speed for the track where this accident occurred. That speed limit was 40 mph. The defendant railroad is entitled to operate its trains at that speed at this location.
At the time of the accident ditch lights were authorized but not required under the appropriate federal regulation. Thus, if you find that at the time of the accident the ditch lights were not working, this was not a violation of federal law.
Adequate jury instructions are those that fairly and reasonably convey the issues and provide correct principles of applicable law. Sanders v. Bain, 31,362 (La.App.2d Cir.12/9/98), 722 So.2d 386. As previously stated, in light of our finding regarding preemption, we find no error in the above instructions. The charge includes correct statements of the law and the trial court's previous rulings in the case. The trial court has discretion in selecting jury instructions and the language therein. Absent an abuse of that discretion, we will not disturb the decision of the trial court. In fact, as the reviewing court, we must exercise great restraint, setting aside a verdict only where the instructions misled the jury to such an extent as to prevent it from doing justice. Id. That is simply not the case here.

Denial of Plaintiffs' motion for JNOV and/or new trial
In assignment of error number eight, Plaintiffs first argue that the verdict was contrary to the law and evidence and that the trial court's denial of their motion for JNOV and/or new trial was, therefore, error. According to La. C.C.P. art.1971, et seq, a new trial may be granted when (1) *764 the judgment is clearly contrary to the law and evidence; (2) newly discovered evidence has been found; (3) improper jury behavior occurred; or (4) good grounds exist. Winford Company, Inc. v. Webster Gravel and Asphalt, Inc., 571 So.2d 802 (La.App. 2d Cir.1990). A trial court judgment denying a motion for new trial should not be reversed absent an abuse of discretion. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir. 1991). Plaintiffs' argument that the verdict in this case is contrary to the law and evidence is supported by their position on preemption; and, since we find no error in the trial court's conclusions regarding preemption, we also conclude that there was no abuse of discretion in denying Plaintiffs' motion for new trial on this basis.
Additionally, Plaintiffs argue that a new trial was warranted based on newly discovered evidence. If an application for new trial is predicated upon alleged newly discovered evidence, the moving party bears the burden of proving that: (1) the evidence was discovered after the trial; (2) the evidence could not have been discovered prior to trial through the exercise of due diligence; and (3) the newly discovered evidence would tend to change the result of the first trial. Winford, supra. The alleged newly discovered evidence in this case concerns the funds used to install the warning signs at the S. 24th Street crossing and, according to Plaintiffs, proves that the expenditure of funds was merely to bring the crossing into compliance with the MUTCD, i.e., a "passive warning enhancement project." The only relevance of this evidence is to support Plaintiffs' argument that the adequacy of the warning devices was not subject to preemption. In fact, the trial court was of the opinion that the evidence was not "newly discovered" and stated that it would not have changed the trial court's ruling on preemption. Due to the recent holding in Shanklin, supra, and our finding of federal preemption, we find this issue to be moot.

Operation Lifesaver
During the trial of this case, a media campaign called Operation Lifesaver came to Ouachita Parish. The aim of Operation Lifesaver campaigns is to promote crossing safety awareness and, appears skewed in favor of railroads. Apparently, the messages broadcast during the Operation Lifesaver media "blitz" attribute the fault of most train/automobile accidents to inattentive motorists while attempting to portray train crews as the victims. During the Monroe campaign, several newspaper articles appeared regarding crossing safety, radio spots were played on numerous stations and stories were run on local newscasts covering the Operation Lifesaver activities. Plaintiffs' counsel, as well as UP's counsel and the trial court, expressed great concern over the extent of the media coverage and the "pro-railroad" or "anti-motorist" messages being broadcast throughout the Monroe community and the possible effects on the jury. On the first day the Operation Lifesaver activities were in the local newspaper, Plaintiffs' counsel made the following request of the trial court:
I am asking the court to provoke a hearing and see if any juror is aware of these notorious extrajudicial statements. Not whether they're influenced by them, but that they're just aware of them. If they've read them, their spouses read them and mentioned it, I'm asking you to strike this jury. I think you have the right to do that... and I think you need to provoke a hearing and examine privately without me present, without Counsel being present, each juror individually. And if you find that they cannotthat they've been influenced by thisby just the mere fact of reading it against your admonition or discussed it in this room or with their spouse or anyone or heard it on television, I think you ought to strike this jury, Judge, and you try this case as the judge.
*765 The trial court subpoenaed and viewed, with counsel present, videotapes of the media coverage. An immediate voir dire of the jury was conducted, during which the trial judge interviewed each individual juror to ensure that the jury had not been tainted by the media blitz. Satisfied that the jury remained impartial and untainted, the trial court, with Plaintiffs' counsel's agreement, allowed the trial to continue. When additional articles and radio spots were run, a second voir dire of the jury was conducted, with counsel asking the questions of the individual jurors rather than the trial judge. Ultimately, as the result of increasing media coverage, a third voir dire was conducted, again with questioning of individual jurors by counsel. After this questioning of the jurors concerning the media coverage, the trial court remained satisfied that the jury had not been affected, stating:
Based upon this hearing and the answer of all fourteen individuals the Court finds that the jury has not been tainted in any manner or influenced in any manner by what may have been aired on any local or regional radio station in the Monroe area.
We note that at no time during the trial did Plaintiffs actually move for a mistrial; rather, Plaintiffs' request was to strike the jury and have the judge conduct the trial as trier of fact.[14] We find it significant that, after each voir dire, the trial continued without further objection. In any event, we find no error in the trial court's allowing the trial of this case to continue despite the presence of Operation Lifesaver in the Monroe area. The record reveals that the trial court was extremely conscientious in examining the jurors regarding the media coverage and, in its wide discretion, determined that the jury was not tainted. We find no abuse of discretion in the trial court's finding in this regard.
Plaintiffs also assert that newly discovered evidence revealed a much stronger connection between UP and the Operation Lifesaver campaign, which entitles them to a new trial. The crux of Plaintiffs' argument is that UP essentially controlled and orchestrated the media blitz in Monroe to coincide with the trial. Again, we note that the trial court is vested with wide discretion in determining whether sufficient grounds for JNOV or new trial exist. After vigorous argument from both counsel on this issue, the trial court was satisfied that the presence of the Operation Lifesaver campaign in Monroe during the trial was merely coincidental. There was no finding that any participation on the part of UP in the planning or support of Operation Lifesaver campaigns in general was utilized to intentionally orchestrate the media blitz to coincide with the trial. The trial court was in the best position to hear and evaluate the arguments of counsel in this regard. We do not believe that, had this alleged new evidence been in the possession of Plaintiffs and the trial court during trial, the outcome would have been different. Winford, supra. The relevant inquiry is whether the jury was tainted by the media publicity to such an extent as to prevent a fair trial of this case. As previously stated, the trial court was convinced that the jury was not tainted and we decline to disturb its findings in that regard. Denial of Plaintiffs' motion for JNOV or new trial based on Operation Lifesaver was not error.

Involuntary dismissal of the City of Monroe
In assignment of error number six, Plaintiffs challenge the trial court's grant of an involuntary dismissal in favor of the City of Monroe. At the close of Plaintiffs' *766 evidence, the City of Monroe moved for an involuntary dismissal arguing that Plaintiffs had failed to show that it had breached any duty owed to Mr. Furlough. Specifically, counsel for the City of Monroe argued that the appropriate warning signs were in place and that it had actually gone further than required by law in painting pavement markings on S. 24th Street to give additional warning of the crossing to approaching motorists. The trial court took the motion under advisement and ruled the following day, granting the motion and dismissing Plaintiffs' claims against the City of Monroe with prejudice. The trial court did not provide oral or written reasons for its ruling.
The trial court has much discretion in determining whether a motion for involuntary dismissal should be granted. Mott v. Babin Motors, Inc., 451 So.2d 632 (La.App. 3d Cir.1984). When reviewing a motion for involuntary dismissal, the trial court must evaluate all of the evidence and render a decision based upon the preponderance of the evidence. King of Hearts, Inc., v. Wal-Mart Stores, Inc., 27,137 (La.App.2d Cir.8/23/95), 660 So.2d 524. Further, an appellate court should not reverse an involuntary dismissal in the absence of manifest error. Adger v. Dillard Department Stores, Inc., 27,582 (La. App.2d Cir.11/1/95), 662 So.2d 864; Poland v. Glenn, 623 So.2d 227 (La.App. 2d Cir. 1993), writ denied, 629 So.2d 1171 (La. 1993). In reviewing an involuntary dismissal, an appellate court must determine (1) whether there is reasonable factual basis in the record for the finding of the trial court and (2) whether the record establishes that the finding is not manifestly erroneous. Silva v. Calk, 30,085 (La. App.2d Cir.12/10/97), 708 So.2d 418. On this record, we find no manifest error in the trial court's grant of an involuntary dismissal in favor of the City of Monroe.
The City of Monroe does not dispute that it has certain duties with respect to street/roadway conditions and the safety thereof, as well as certain duties relating to railroad crossing conditions and the warnings/signage therefor. This record, however, does not support a finding that any such duties were breached by the City of Monroe with respect to the S. 24th Street crossing. First, we find no manifest error in the trial court's conclusions regarding the adequacy of the warning devices at the crossing. Moreover, we note that the City of Monroe had placed pavement markings in advance of the crossing, which are not mandated by law, to further warn motorists of the existence of the crossing. Regarding the alleged sight obstructions at the crossings, Plaintiffs' expert testified that, at 24 feet from the crossing, Mr. Furlough had an unobstructed view of the tracks. Additionally, although the record does reveal six previous accidents at this crossing, the most recent at the time of this accident in 1995 was in 1987. We acknowledge that there was conflicting evidence presented on many of these points; however, governed by the manifest error standard, our review discloses a reasonable factual basis for the trial court's granting of the City of Monroe's motion. Accordingly, we will not disturb the granting of that motion.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs are taxed to Plaintiffs/Appellants, Juanita Furlough, et al.
AFFIRMED.

APPLICATION FOR REHEARING
Before NORRIS, STEWART, CARAWAY, PEATROSS, and KOSTELKA, JJ.
Rehearing denied.
NOTES
[1] Union Pacific Railroad Company was formerly Missouri Pacific Railroad Company. For clarity, we will use the current name of the railroad, Union Pacific or "UP," throughout this opinion.
[2] The additional plaintiffs are the adult children of Mr. Furlough and include two daughters, Judiana Cotton and Denise Grayson, and two sons, Andrew Furlough, Jr. and Gary Furlough.
[3] We note that an involuntary dismissal was proper at this juncture because Plaintiffs' claims against the City of Monroe, a political subdivision, were tried before the trial judge rather than the jury. See La. R.S. 13:5105.
[4] At the location of the accident, S. 24th Street runs east/west and the railroad track, which is UP's main track through Monroe, runs north/south.
[5] There is a discrepancy in the record as to the exact number of cars in the train. The record or "consist" kept by the railroad company, however, clearly states that the train was originally to have 75 cars. The record further indicates that one of the cars was removed from the train due to an unknown defect prior to its departure from McGehee, Arkansas. The train was en route from McGehee to Alexandria, Louisiana.
[6] Ditch lights are similar to headlights which are placed on either side of the engine to cast light on the sides of the tracks. There is no dispute that ditch lights aid in the visibility of the train, especially in inclement weather.
[7] The Supremacy Clause of Article VI of the United States Constitution provides Congress with the power to preempt state law. See U.S. Const. art. VI, cl. 2. In United Transportation Union v. Foster, 205 F.3d 851 (5th Cir.2000), the fifth circuit explained:

Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the states to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. Preemption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation.
The critical question when determining whether or not federal preemption exists is whether Congress intended that federal regulations supersede state law. Preemption will not lie unless it is the clear and manifest purpose of Congress. CSX Transportation, Inc., v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Evidence of preemptive purpose is sought in the text and structure of the statute at issue and, if the statute contains an express preemption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent. Id. and cases cited therein.
[8] The Federal Railroad Safety Act, 49 U.S.C. § 20106 (formerly 45 U.S.C. § 434), was enacted "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." The FRSA provides that the Secretary of Transportation "as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations." 49 U.S.C. § 20103. Congress expressly defined the preemptive scope as follows:

Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A state may adopt or continue in force an additional or more stringent law, regulation, or order, or standard related to railroad safety when the law, regulation, or order(1) is necessary to eliminate or reduce an essentially local safety hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce.
49 U.S.C. § 20106.
[9] In response to UP's motion in limine, Plaintiffs initially argued that Easterwood, supra, is distinguishable from their claim in that, in this case, there is conflicting evidence regarding into which "class" of track the S. 24th Street crossing should fall. While this argument was not advanced on appeal, we note that a similar argument was advanced and rejected by the third circuit in the recent case of Cart, supra. In rejecting this argument, the court in Cart relied upon Easterwood in holding that "these regulations preclude the state from imposing its own classifications on tracks subject to the FRSA and the above referenced regulations." In any event, as previously stated, the record in this case establishes that the records of the federal government classify this track as class three with an allowable speed limit of 40 miles per hour. Plaintiffs' contention that the track should be classified otherwise, for whatever reason, does not preclude federal preemption of the issue of excessive speed of this train.
[10] Plaintiffs acknowledge that most cases which have found that an "essentially local hazard" alone exists have declined to provide an exception to preemption. Our review of the jurisprudence supports this conclusion; and, therefore, we will not address this issue in detail. Instead, we will focus on Plaintiffs' central argument on appeal concerning the existence of a "specific, individual hazard."
[11] We also note that, in the present case, as in Western Company of North America, supra, Plaintiffs could have, and, in fact, did introduce evidence of the train's speed for illustrative purposes, i.e., purposes other than showing the train's negligence.
[12] At the time of the accident, this section was an interim rule providing, in pertinent part:

§ 229.133 Interim locomotive conspicuity measuresauxiliary external lights.
(a) A locomotive at the head of a train or other movement is authorized to be equipped with external lights, additional to the headlight required by § 229.125, for the purpose of improved conspicuity....
[13] The propriety of the trial court's instructions was also assigned as error by Plaintiffs and is addressed, infra, under the appropriate assignment of error.
[14] In its ruling on Plaintiffs' motion for new trial, the trial court stated that Plaintiffs' counsel "brought [Operation Lifesaver] to the court's attention and moved for a mistrial." Apparently, the trial court accepted Plaintiffs' motion to strike the jury as a motion for mistrial. While technically incorrect, since we find that the trial court's denial of Plaintiffs' request was not error, for the reasons discussed infra, the form of Plaintiffs' request is immaterial.