865 So.2d 896 (2004)
Roosevelt CLAYTON
v.
ILLINOIS CENTRAL RAILROAD COMPANY, et als.
No. 03-CA-972.
Court of Appeal of Louisiana, Fifth Circuit.
January 27, 2004.
Rehearing Denied February 20, 2004.
*897 Edmond R. Eberle, New Orleans, LA, for Appellant.
David S. Kelly, Lisa A. Easterling, Robert S. Emmett, New Orleans, LA, for Appellees.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Plaintiff/appellant Roosevelt Clayton appeals a directed verdict in favor of the defendants Illinois Central Railroad Company, d/b/a Canadian National/Illinois Central Railroad Company (hereinafter "CN/IC"), train engineer Harold Woodall, conductor Clyde Cutrer, Jr., and brakeman Curtis Eugene, dismissing his lawsuit with prejudice. We affirm.
Mr. Clayton filed suit in the 24th Judicial District Court, alleging that on September 5, 1997, he was struck by a train owned by CN/IC and operated by the Cutrer, and that as a result he sustained serious injuries. He alleged, among other things, that the crew was negligent in speeding; in failing to have the train equipped with proper brakes or omitting to apply such brakes after seeing him in a perilous position; in failing to keep a proper lookout; in failing to continuously sound the horn; and in failing to stop the train in time to avoid the accident. The petition was later amended to add that the crew was negligent in operating the locomotive with the long nose forward, since it was safer to use the engine with the short hood in the lead because of (1) increased visibility due to the existence of ditch lights and running lights, all of which would have increased illumination of the tracks; (2) the placement of the horn on the short hood nearer the front of the engine; and (3) the position of the engineer nearer the front of the short engine.
Prior to trial, CN/IC filed a Motion for Partial Summary Judgment, which was granted, dismissing Mr. Clayton's claims regarding train speed, braking and ditch lights as being preempted by federal law. The court also granted judgment dismissing the claim that CN/IC failed to light the right of way, but denied summary judgment relative to the operation of the locomotive with its long-nose forward. A Motion in Limine to exclude the testimony of Mr. Clayton's proposed expert, Ronald Williams, was also granted. Writs on the latter judgment were denied by this court,[1] and by the Supreme Court.[2]
The matter was tried to a jury. At the close of Mr. Clayton's presentation of evidence, CN/IC and the other defendants moved for a directed verdict on the grounds that Mr. Clayton had failed to establish breach of duty and causation. The trial court granted the directed verdict, finding that Mr. Clayton failed to offer any evidence that CN/IC and the other defendants deviated from the applicable standards of care "in any manner legally causative of plaintiff's September 5, 1997 accident and injuries." Mr. Clayton appeals, urging that the court erred in granting the directed verdict as well as in excluding certain evidence.
*898 The facts of the case are, essentially, that on the evening of the accident, the train crew was returning to Mays Yard in Harahan, its point of origin, after traveling that day to Destrehan and switching freight cars. Mr. Clayton was returning home on foot on the evening in question, utilizing an ungraded footpath some 750 feet from the nearest graded crossing at Filmore Avenue, in Kenner. For some reason, he sat on the tracks at this point, and when the CN/IC train approached, the conductor Cutrer saw what he believed was a pile of leaves or rags, then thought it was perhaps a dog, on the tracks. The engineer Woodall tooted the horn to scare away (what was thought to be) the dog. As the train approached, Cutrer realized that the object was a human being, and yelled for the engineer to "plug them" or go into emergency brake mode. Although the engineer did apply the brakes, unfortunately, Mr. Clayton was hit and seriously injured.
Mr. Clayton testified that he did not remember how long ago the accident occurred. He denied being an alcoholic. He does not remember anything about the accident, what he was doing when he was hit, how many drinks he may have had on the night of the accident, or where he had been just before. He did not have any idea how he came to be on the railroad tracks, but he often used the pedestrian paths to visit a friend. Sometimes he forgets and goes blank, but he was truthful in everything that he told to his doctor.
At trial, Woodall testified that at the time of the accident, he had been a certified engineer for just over two years. On the day in question, the train was to leave the Mays yard, go to Destrehan and Good Hope and switch cars, then return. On leaving Mays, the short nose of the engine proceeded forward; that is, the cab of the locomotive was in front of the engine compartment. In that configuration, the engineer sits near the side window, facing the control stand, at a forty-five degree angle from the window. Operating with the long nose forward, that is, with the locomotive's cab behind the engine compartment, he would be about ninety degrees from facing forward, and his back would be against the window. In this position, he would probably not look out the side window when going over the crossings. The headlights on the long end were possibly a little higher than on the short end, but this would not compromise the ability of the crew to see a person on the track.
On the night of the accident, the engine was pulling twenty-nine cars, some of which carried hazardous materials. As the train passed through Kenner, it was going 20-25 miles per hour. Before the crossings, the engineer blows the horn and rings the bell until the train occupies the crossing, and he did so that evening. After the grade crossing at Filmore Street, Woodall did not blow the horn or ring the bell again before the locomotive struck Mr. Clayton.
East of the Filmore crossing, the track curves to the south and then back to the east. Woodall did not see Mr. Clayton, because it was night, and because of the curvature of the track. The track curved to the right and the lights were shining straight ahead, and did not illuminate the area where Mr. Clayton was. Either the conductor or the brakeman can put the train in emergency braking. Woodall used the automatic brake for Mr. Clayton, because using the emergency brake could have caused the train to jack-knife and derail the hazardous materials. At the time of the accident, the brakeman would have been positioned facing in the opposite direction.
No roads intersect the track east of Filmore for another two miles, although *899 Woodall knew of the existence of a paved pedestrian crossway at Richards Avenue, two or three blocks from the scene of the accident. At this intersection, he blows the horn 900 feet, as required by law, before the crossing. However, he had never seen anyone crossing at that point.
Clyde Cutrer Jr. was the conductor on the night of the accident. When the locomotive goes long nose first, he looks out of a window in the right side back panel of the cab, from which one can see on the left of the engine until very close to an object, about 150-200 feet away. In his opinion, the engineer did not see Mr. Clayton because of the curve in the track. On that night, the train had blown its whistle and horn for all crossings, including at Filmore, until the engine had occupied that crossing for about 20-30 feet. With the headlights on at night, one could see three or four hundred feet in the curve. Cutrer saw something in the track, but at first, thought it was a pile of leaves. It was about two or three hundred feet in front of the train. A fraction of a second later, he yelled ".. is this a German Shepherd dog or what the heck is that.." He thought that Woodall tooted twice to alert whatever it was, and then Cutrer stood up quickly, realizing it wasn't a dog when he saw the yellow bill of a football cap. He yelled for Woodall to "plug them," a common term for putting the train in emergency. When Cutrer realized it was a person, the train was very close. According to the transcript, the court clarified the position in which Mr. Clayton was sitting for the record, which had been demonstrated by the witness, as sitting on the floor "Indian-style, with his legs folded up beneath him, with his head down as far as his[sic] could go ... elbows on his knees." His head was in his lap, and he did not move. Photos show that the train horn faces in four directions.
Cutrer did not see the engine strike Mr. Clayton, who was right in the curve of the tracks when the engine hit. The horn was not sounded. Mr. Clayton was found five or six cars behind the engine at a forty-five degree angle to the main line and he was unconscious. Cutrer was familiar with the concrete walkway used to cross the tracks at that point. The railroad regularly put up no trespassing signs, which were generally torn down within twenty-four hours.
Curtis Eugene, the brakeman, testified that it was not customary to turn the locomotive around because it can run either long nose or short nose. On the night of the accident, he could not see the track ahead as he sits in back of the conductor. He did hear the conductor tell the engineer to "plug it."
Robert J. McCormick, a risk manager at CN/IC, investigated the accident. He spoke with the conductor on the night of the accident, but not with the engineer, who remained in the locomotive. The conductor told him that the train approached Filmore, blowing the horn, and that he saw an object on the tracks. At first, he did not know what it was, but it never moved. McCormick does not record statements, but the crew fills out certain forms. He gets his information from the crews as well as from the police officers on the scene. Using information from the police report, he estimated that Mr. Clayton was found 550 feet from the front of the train. Prior to the accident, he was not aware of a pedestrian crossing at that point. When he investigated the scene, he found a well worn path with a piece of wood across a ditch, but he did not know who built that crossing. The footpaths described by the witnesses were not created by the railroad. Because the railroad is private property, it attempts to discourage people from taking makeshift short cuts.
*900 When the train comes from Kenner, as it passes over Filmore the track begins to curve to the north, around Bengal and Wilker Neal Streets, or from the crew's perspective, to the right. According to the records of the railroad, no special instructions were issued for the train with regard to the tracks between Filmore and Little Farms Avenue, the area where the accident occurred.
Tammy Minor, James Sledge, and Bobby Buckner knew Mr. Clayton and lived in the vicinity. They all testified that the crosswalk where Mr. Clayton was injured had been used for years. Sledge and Buckner still use the pathway. Sledge testified that the train horn can be hear a quarter of a mile away, and at night, he can see the train coming from about two blocks away.
Deputy Ray Bedwell investigated the accident for the Jefferson Parish Sheriff's Office. He testified that he spoke with, and statements were taken from, the conductor and the engineer. Mr. Clayton was no longer at the scene when he arrived. Some approximate measurements were taken at the scene, and the distance between blood found on the tracks and engine was 540 feet. Although Bedwell determined that Mr. Clayton was on the railroad tracks, near a cross tie, he did not know the exact point of impact. He was not, according to the deputy, near the paved crossway, which was about two blocks down. He did not see the informal pathway used by the neighborhood residents.
Mrs. Estella Munson testified that she and her husband used to work with Mr. Clayton, and on the night of the accident, he had been at their house, drinking. According to Mrs. Munson, he had about three drinks and was not drunk when he left her house.
Dr. Mary Mathai examined Mr. Clayton for a Social Security evaluation four months after the accident. Mr. Clayton told her that he had been hit by a train and dragged, and did not remember anything else about the incident. After discussing his many serious injuries, Dr. Mathai, who was not his treating physician, disclosed that the medical history which she reviewed indicated that an hour following the accident, Mr. Clayton's blood alcohol level was 0.337. Dr. Mathai opined that at the time of the accident, the blood alcohol level would have been higher. The hospital records themselves were admitted into evidence.
In the Motion For Directed Verdict, CN/IC argued that there was no credible evidence presented to suggest negligence on the part of any member of the crew, and no evidence to prove a deviation from the applicable standard of care owed by any of the three individuals. There was no evidence to suggest that the crew could have seen Mr. Clayton earlier, and blown the whistle, and no evidence to suggest that anything they could have done after they saw him could have prevented the accident. With respect to CN/IC itself, it was argued that there was no evidence of any negligence or deviation from care by the railroad in the operation of the train, including the speed, the manner of operation or the configuration of the engine. According to CN/IC, there was no negligence issue to take to the jury, and no evidence that any possible negligence contributed to, or legally caused, the accident.
The court declared that without knowing the duties of each crew member, it could not be determined what the standard of care was, and that it heard no testimony on this issue. Although some measurements were taken, the court did not know, from the evidence, what happened to Mr. Clayton, where he was at the moment he *901 was hit, or how far his body was carried. It was not shown how soon the brakes would have to have been applied to avert the accident, or how much the long nose configuration played in the situation. The court stated:
... the conductor, it is my remembrance, is the person who has to look out, and he was, and he saw, and as soon as he saw he did. This is at midnight I mean, the paths were there, but, you knowand again, I undid [sic] the speed because they were only going twenty to twenty-five miles and hour, when the could have been going sixty to seventy sixty-five to seventy is my remembrance. The horn was blown at Filmore Street, which is just a briefa short distance from this. One of the witnesses, one of plaintiff's witnesses said that you can hear that horn all the way down to Jackson Street, which is a distance past Filmore Street ...
The standard applicable to motions for directed verdicts has been set forth by this court as follows:
A motion for a directed verdict is a procedural device available in trials by jury with an eye toward judicial economy. The motion is appropriately made at the close of the evidence offered by the opposing party and should be granted when, after considering all of the evidence in the light and with all reasonable inferences most favorable to the movant's opponent, it is clear that the facts and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary result. However, if there is evidence produced in opposition to the motion that has such quality and weight that reasonable and fair-minded men, exercising impartial judgment, might reach different conclusions, then the motion should be denied and the case should be submitted to the jury.
The trial court has much discretion in determining whether or not a motion for a directed verdict should be granted. (Cites omitted.)[3]
Mr. Clayton points out that in denying his Motion For New Trial, the court stated that it granted the directed verdict "based upon the Plaintiff's failure to prove the Defendant's negligence and the Plaintiff's failure to prove a strict liability claim." Mr. Clayton argues that this wording proves that the court used the wrong legal standard, that of preponderance of the evidence, when it considered the Motion for Directed Verdict.
Under the duty-risk analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Whether a duty is owed is a question of law.[4] The inquiry is whether the plaintiff has any law, statutory, jurisprudential, or arising from general principles of fault, to support his claim.[5]
The duty of the railroad crew regarding pedestrians on the tracks has been described as follows:
Except for those areas designated for the public to cross the railway, a pedestrian has no right to be on the right-of-way, which is essentially private property.... *902 There is a long line of jurisprudence in this State to the effect that an engineer, when sighting a person or a vehicle on the track, can presume that he or it will move from the position of danger upon the sounding of the train's bell or the blowing of its whistle or horn; and, that it is only when the engineer realizes that the warnings are not going to be heeded that he should make an effort to stop the train.[6]
As CN/IC points out, the court noted that aside from the missing links in Mr. Clayton's case, some of the evidence presented showed that the warning signals were properly blown at the designated intersections, according to law[7], that the conductor kept a lookout as he was required to do, that at the moment he recognized the danger he warned the engineer, and the engineer promptly applied the brakes. The oral reasons given at the time the Motion was granted show clearly that the trial court recognized that Mr. Clayton presented no evidence to show any action or inaction on the part of the CN/IC defendants which contributed to or caused the accident. There was no testimony or other evidence, that given the time of night, the curvature of the tracks, and his inert position on the cross tie, that Mr. Clayton's perilous position should have been recognized by the crew prior to the moment he was noticed. There was no evidence that the crew should have been able to stop the train in sufficient time to avoid the accident. There was no evidence to conclude where Mr. Clayton was on the track when struck, or how far away the engine was from him when he was recognized as a human being in a dangerous place. Thus, Mr. Clayton failed to produce a case that CN/IC failed to conform its conduct to an applicable standard of care, and that any such failure was a cause-in-fact of his injuries.
Mr. Clayton avers that despite the denial of summary judgment on the locomotive long nose/short nose issue, at trial the court upheld objections by CN/IC to questions regarding ditch lights on the long nose configuration. Thus he asserts that he was prevented from developing his contention that the availability of ditch lights on the short nose end made the choice to proceed with the long nose end "unsafe and unnecessarily hazardous to a man who was sitting motionless in a crosstie and allegedly not seen until it was too late." Mr. Clayton argues that at the time of the accident, ditch lights were not required by federal law, but were voluntarily placed on the short nose end. Thus he argues the underlying principle of preemption does not apply. We find this to be a distinction without a difference. In the partial summary judgment, the trial court correctly determined that the ditch light issue was pre-empted by federal law,[8] and questions on the point were properly excluded.
Mr. Clayton made no showing that simply utilizing the long nose configuration was in any way negligent. Federal law specifically recognizes that operation of the engine in either configuration is permitted.[9] Further, although Mr. Clayton attempted to elicit testimony that the view from the long nose end is diminished, the *903 crew testified that one could see on both sides until very near an object, 150-200 feet. There was no expert opinion or other evidence that this configuration in and of itself was dangerous, and the engine was designed to operate in either direction. The conductor kept a lookout on the track ahead, and as the trial court noted, there was no testimony as to the duties of the crew, or more precisely, who had the responsibility to keep lookout. Thus no basis was established on which to make a finding that someone on the crew breached a duty. There was no evidence that the train itself had defective brakes, lights, or other accoutrements, or was traveling at an excessive speed.
Mr. Clayton contends that the court made credibility determinations which are improper in a Motion for Directed Verdict. He avers that the court "blindly" accepted the testimony of the conductor as his sighting of the object on the tracks, and the point at which he determined it was a person. Acceptance of this testimony is not a credibility determination in that it was not refuted. There was no evidence that the conductor did, could, or should have seen Mr. Clayton earlier.
Finally, Mr. Clayton argues that the court failed to consider the unimpeachable evidence revealed by the event recorder. Although the data was admitted, no testimony or interpretation of the data was offered by Mr. Clayton. Our examination of the data shows that this evidence must be interpreted by a witness with the expertise to do so in order to be intelligible to the non-professional. Thus the court could only consider the evidence as presented, and as presented in that form, had little if any probative value.
The evidence presented at trial, considered in a light most favorable to Mr. Clayton, point so overwhelmingly in favor of granting the motion that reasonable jurors could not arrive at a contrary result. He did not provide evidence of any breach of duty on the part of CN/IC or its crew. He did not prove that any action or inaction on the part of the defendants was a cause-in-fact of his injuries. Failure to produce evidence on these crucial factors, and failure to produce any law, statutory, jurisprudential, or arising from general principles of fault, to support his claim was fatal to his case. The trial court did not err in granting the Motion for a Directed Verdict.
For the above reasons, the judgment is affirmed. Costs are assessed to Mr. Clayton.
AFFIRMED
NOTES
[1] Clayton v. Illinois Central Railroad Co. et al., 01-00625, (6/25/01).
[2] Clayton v. Illinois Central Railroad Co. et al., 2001-CC-2086, 797 So.2d 50 (La.9/14/01).
[3] Reed v. Columbia/HCA Information Systems, Inc., 00-18 (La.App. 5 Cir. 4/11/01), 786 So.2d 142, writ denied XXXX-XXXX (La.6/22/01),794 So.2d 796.
[4] Hardy v. Bowie, 1998-2821 (La.9/8/99), 744 So.2d 606.
[5] Id.
[6] Kaplan v. Missouri-Pacific R. Co. 409 So.2d 298, (La.App. 3 Cir., 1981), writ denied 411 So2d 464 (La. 1982), citations omitted; see also Robinson v. Norfolk Southern Corp., 2003 WL 21638245 (E.D.La., Jul 11, 2003).
[7] See La. R.S. 32:168.
[8] See Furlough v. Union Pacific R.R. Co. 33-762, 33,658 (La.App. 2 Cir. 8/31/00), 766 So.2d 751, writ denied 2000-2929 (La. 1/12/01), 781 So.2d 556.
[9] See e.g. 29 C.F.R. 229.125.