780 So.2d 563 (2001)
Jerrod SNEARL and Ellouise Stewart
v.
Gary T. MERCER, Mercer Construction Services, Bituminous Ins., Co., Succession Representative of the Estate of Benny L. Frank, ABC Ins. Co., and State of Louisiana Through the Department of Transportation and Development
Dalton Olinde
v.
Gary T. Mercer, Mercer Construction Services, Bituminous Ins., Co., Succession Representative of the Estate of Benny L. Frank, ABC Ins., Co., and State of Louisiana Through the Department of Transportation and Development
Nos. 1999 CA 1738, 1999 CA 1739.
Court of Appeal of Louisiana, First Circuit.
February 16, 2001.
Rehearing Denied April 2, 2001.
*568 Joseph J. McKernan, Kirby Guidry, Baton Rouge, Patrick Pendley, Plaquemine, Counsel for Plaintiffs-Appellees Jerrod Snearl and Ellouise Stewart.
Lewis O. Unglesby, Baton Rouge, Allen J. Myles, Plaquemine, Counsel for Plaintiff-Appellee Dalton Olinde.
Roy Maughan, Sr., Baton Rouge, Counsel for Plaintiff-Appellee Rhonda Frank.
Henry Salassi, Jr., Keith C. Armstrong, Baton Rouge, Counsel for Defendant-Appellant State of Louisiana.
Gregory Di Leo, New Orleans, Counsel for Intervenor LA Safety Assn. of Timbermen.
Before LeBLANC, KUHN and MOORE,[1] JJ.
D. MILTON MOORE, III, J. Pro Tern.
The State of Louisiana, through the Department of Transportation and Development, (DOTD) appeals an adverse judgment entered on a jury verdict. The jury found DOTD 90% at fault in this personal injury case. The remaining 10% of fault was attributed to the driver of the dump truck, Benny Frank, in which the plaintiffs, Jerrod Snearl and Dalton Olinde, were passengers. Following post-trial proceedings, the District Court entered judgment in accordance with the verdict, decreeing that DOTD was 90% at fault, and thus liable for the damages, which totaled in excess of $9 million for Snearl and in excess of $1 million for Olinde. Snearl's mother, Ellouise Stewart, was awarded $300,000 for loss of consortium. The trial court imputed the 10% fault of the driver, Frank, to the plaintiffs' employer, Gary Mercer Construction Services, Inc. and reallocated the employer fault to DOTD. DOTD appeals.

FACTS
On November 16, 1994, Snearl, Olinde and Frank, all employees of Mercer Construction, left Brusly, Louisiana, around 6:30 a.m. in a company dump truck to travel to a job site on Airline Highway where they were scheduled to cut and clear trees. Frank was driving while Snearl sat in the front seat between Frank and Olinde. As the unloaded dump truck approached the Interstate Highway 12 (I-12) overpass at Jefferson Highway, Frank suddenly swerved into the left lane. Because the dump truck's bed was empty, the *569 truck's brakes locked, causing the truck to rotate and skid. When the brakes were released the truck careened into the bridge rail along the overpass and vaulted over the railing to the ground below.
The bridge rail on the I-12 overpass at Jefferson Highway was comprised of a safety walk, parapet and aluminum handrail. The safety walk is a curb in front of the railing wall, 10 inches high by 18 inches wide. The curb and parapet together form the barrier wall. The aluminum handrail on top is for ornamental purposes only, providing no structural benefit.
The truck slid along the top of the railing before falling approximately 30 feet onto the banks of Ward's Creek. The truck hit the ground nose first and then flipped over, crushing the passenger compartment. The truck caught fire sometime after landing on the creek bank. Mark McInnis, an LSU student on his way to classes, dragged Olinde from the truck, probably saving his life. Snearl was caught in the cab after the fire started, unable to move because of significant injuries, including a broken pelvis. Frank was burned to death in the accident.
Snearl sustained severe burns; both of his legs and his penis were later amputated. Olinde sustained a broken left pelvic bone, left arm and nose, a crushed chest, burns and abrasions. He initially spent four months in a hospital and later returned for shoulder surgery.
The case was tried before a jury in Iberville Parish between October 514, 1998. By special interrogatories the jury found that the bridge railing in question presented an unreasonable risk of harm, that DOTD should have known of the unreasonable risk of harm, and that DOTD had a reasonable opportunity to remedy the unreasonable risk of harm. The jury found that the unreasonable risk of harm was a proximate cause of the damages suffered by the plaintiffs. The jury also found Frank negligent and found that his negligence was a proximate cause of the damages. The jury made a further finding that the driver of a gold Volvo, which was alleged to have suddenly pulled in front of Frank prior to Frank losing control of the dump truck, was not negligent. The jury assigned 90% fault to DOTD and 10% fault to Frank.
The jury awarded Snearl damages as follows: $475,104.67 for medical expenses; $3 million for future medical costs and future life care; $41,698 for actual lost earnings to date of trial; $536,074 for future impairment of earnings; $1 million for past and future pain and suffering; $1 million for past and future mental pain and anguish; $1 million for loss of enjoyment of life; $1 million for permanent disability; $1 million for permanent disfigurement; for a total award of $9,352,826.67.
The jury awarded damages to Olinde as follows: $151,145.38 for medical expenses; $25,000 for future medical costs and future life care; $119,099 for future impairment of earnings; $200,000 for past and future pain and suffering; $200,000 for past and future mental pain and anguish; $200,000 for loss of enjoyment of life; $200,000 for permanent disability; $15,000 for permanent disfigurement; for a total award of $1,110.244.38.
The jury found that Ellouise Stewart, mother of Snearl, suffered a loss of consortium and awarded her $300,000.
DOTD appeals, urging 5 assignments of errors, to-wit:
I. The verdict and judgment finding that the bridge railing presented an unreasonable risk of harm are legally and manifestly erroneous.
II. The verdict and judgment finding Benny Frank only 10% at fault in causing the plaintiffs' damages are manifestly erroneous.
III. The trial erred as a matter of law in requiring DOTD to pay 100% of plaintiffs' damages.

*570 IV. The trial court prejudicially erred in permitting plaintiff to testify regarding the alleged "defect".
V. The jury's damage awards are excessive.
Before addressing the appellant's assignments of error, a number of related and preliminary procedural matters must be addressed by the court. Discussion of these matters follows.

MOTION TO INTERVENE
Judgment was signed and filed on December 4, 1998. DOTD timely filed a motion and order for suspensive appeal on December 14, 1998. On April 11, 2000, a "Motion for Intervention and Incorporated Memorandum in Support" on behalf of the American International Group Technical Services, Inc. (AIG) was filed with this court. AIG's motion noted that it wished to intervene in the instant appeal, representing that AIG was the excess insurer of the State. AIG further averred that it may be liable for payment as the State's excess insurer of all amounts above the limits of the State's self-insured policy of $1 million. AIG further alleged its potential liability to be in excess of $10 million.
AIG wished to intervene by filing an attached brief, which AIG alleged would assist the court in its consideration of the matter on appeal. The motion for intervention alleged that the attached brief raised no new issues or error for consideration on appeal, but rather "only focuses the Court upon the proper standard of review to employ in this matter," as well as replying to the plaintiffs' supplemental brief filed March 1, 2000. On April 26, 2000, in a "Supplemental and Amended Motion for Intervention and Incorporated Memorandum in Support," National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), sought to file a similar motion for intervention, alleging that it was erroneously identified as AIG in the previously filed motion for intervention. The supplemental and amended motion sought only to correct the name of the would-be intervenor.
On May 26, 2000, Snearl filed an opposition memorandum opposing the filing of an intervention and/or appeal by AIG and/or National Union. Snearl notes that the motion for intervention "is for all practical purposes an appeal by AIG and/or National Union", noting that neither AIG nor National Union had posted a bond for its appeal, nor did AIG or National Union file a notice of appeal, motion for appeal or any other pleading within the time delays prescribed by articles 2087 and 2123 of the Louisiana Code of Civil Procedure. Snearl urges that while DOTD is exempt by statute from posting a bond, no such exemption exists for the State's insurer. Snearl argues that the would-be intervenors knew or should have known that the jury verdict in the case had been rendered December 4, 1998, or some 16 months prior to the date it filed its motion for intervention. Snearl urges this court to dismiss the motion to intervene by AIG and/or National Union.
The motion to intervene was referred to the panel considering the merits of the appeal. Thereafter, on June 14, 2000, counsel for National Union filed another memorandum entitled "Reply to Plaintiffs' Opposition to Motion for Intervention". In its reply memo, National Union frames the issue in the following manner: "whether [a] person with an interest in the judgment, but who has not been made a party, is obliged to make himself a party to the proceedings by filing its own appeal." National Union contends the answer to this threshold question is "No", citing several cases which purport to grant it the right to intervene in a pending appeal in which an intervenor arguably had an interest.
National Union cites Felix v. St. Paul Fire and Marine Ins. Co., 477 So.2d 676 (La.1985), as authority for its right to intervene in the pending appeal perfected by DOTD. Felix involved a post-judgment intervention by the Commissioner of Insurance and the Patient's Compensation *571 Fund (PCF) in a medical malpractice action. The Commissioner and the PCF believed the judgment to be excessive. In Felix, contrary to the case sub judice, the Commissioner and the PCF filed both a motion to intervene and a motion for devolutive appeal. The Louisiana Supreme Court upheld the right of intervention under La. C.C.P. arts. 1091 and 2086 finding the Commissioner and the PCF had an interest in the action for purpose of appealing the excess judgment against the PCF. Felix, 477 So.2d at 681.
In Chrysler First Financial Services Corp. v. ZIA Corp., 536 So.2d 806 (La.App. 1st Cir.1988), a law firm filed a motion and order for suspensive appeal of a judgment in an executory process matter wherein a mortgage holder had previously intervened, alleging a prior security interest affecting the subject property. Finding that the law firm was not a party to the proceedings prior to the entry of judgment by the trial court, we noted generally, citing La. C.C.P. arts. 1091, 1092 and 2086, that a person not a party to the action in the trial court may take an appeal if he has a right sufficiently affected by the judgment. Chrysler First, 536 So.2d at 807. Finding that the law firm had not alleged any justiciable right related to the principal action, we ordered the law firm to show cause why the appeal should not be dismissed.
In Benoit v. Grey Wolf Drilling, Inc., 498 So.2d 299 (La.App. 3rd Cir.1986), the plaintiff's action was dismissed with prejudice on a successful defense motion for summary judgment. A motion and order of appeal filed by an intervenor was signed by the trial court. The plaintiff himself filed no motion or order of appeal but later filed a motion to join the appeal perfected by the intervenor. However, the delays for perfecting the appeal had run when plaintiff filed his motion to join the appeal. The appeal was dismissed on the appellee's motion. "If the plaintiff is to preserve his right to appeal, he must do [so] himself and not rely on another party." Benoit, 498 So.2d at 300; see also Golden Lane Marine, Inc. v. Bobben Fabricators, Inc., 338 So.2d 116, 117 (La.App. 4th Cir.1976).
National Union confuses the right of a party who has an interest in the judgment to intervene in proceedings with the jurisdictional requirement that a party wishing to appeal an adverse judgment must obtain an order of appeal. There can be no appeal absent an order of appeal because the order is jurisdictional; this lack of jurisdiction can be noticed by the court on its own motion at any time. Baton Rouge Association of School Employees, Local 100 Service Employees International Union, AFL-CIO v. East Baton Rouge Parish School Board, 98-0526, p. 8 (La.App. 1st Cir.4/1/99), 729 So.2d 1154, 1159, writ denied, 99-1278 (La.7/2/99), 747 So.2d 19; Strickland v. Layrisson, 96-1280, p. 4 (La.App. 1st Cir.6/20/97), 696 So.2d 621, 624, writ denied, 97-1940 (La.11/14/97), 704 So.2d 228. The failure of the appellant to obtain an order of appeal forfeits his right to appeal. Stein v. Martin, 98-1370, p. 3 (La.App. 4th Cir.11/18/98), 723 So.2d 1038, 1040; La. C.C.P. art.2088.
In the case sub judice, National Union has presented no arguments that would excuse its failure to obtain and file a timely order of appeal by which it could protect its significant pecuniary interest in these proceedings. Nor has National Union cited any jurisprudence which would permit it to participate in a suspensive appeal without posting security as required by law. Under these circumstances, we find the opposition filed by Snearl to the motion to intervene brought by National Union to be well-founded. Accordingly, we dismiss the intervention filed by National Union as untimely.

PEREMPTORY EXCEPTION OF NO CAUSE OF ACTION
On October 16, 2000, DOTD filed an exception to the consolidated petitions of the plaintiffs, urging that the plaintiffs *572 have no claim under Louisiana law for injuries and damages resulting from the accident of November 16, 1994, because federal law preempts state law in the areas of Interstate Highway design and safety. The exceptors urge that the plaintiffs, on the face of their pleadings and through evidence introduced without objection at trial, have failed to state a cause of action against DOTD. DOTD urges that the petitions should be dismissed under the peremptory exception raising the objection of no cause of action based upon federal preemption. In its memorandum in support of the exception, DOTD correctly notes that a peremptory exception may be filed for the first time in the appellate court. La. C.C.P. art. 2163. Noting that the general rule is that no evidence can be introduced to support or controvert a peremptory exception of no cause of action, Sivils v. Mitchell, 96-2528, p. 4 (La.App. 1st Cir.11/7/97), 704 So.2d 25, 27, and that the well-pled facts are accepted as true when the appellate court is reviewing a ruling on a no cause of action exception, Riley v. Riley, 94-2226, p. 4 (La.App. 4th Cir.9/4/96), 680 So.2d 169, 171, writ denied sub nom., 96-2430 (La.12/6/96), 684 So.2d 932, an exception to the general rule has been recognized to consider evidence introduced at trial in determining whether the exception is well-founded when first raised during an appeal. In such cases, the court would deem the pleadings to have been enlarged by evidence introduced at trial without objection and could therefore consider the evidence in passing upon the exception of no cause of action. City National Bank of Baton Rouge v. Brown, 599 So.2d 787, 789 (La.App. 1st Cir.1992).
Snearl and Olinde, as well as Wanda Frank, widow of Benny Frank, have filed oppositions to the exception of no cause of action, correctly noting that federal preemption is an affirmative defense, which, under La. C.C.P. arts. 1003 and 1005, should be pled in a defendant's answer. Furlough v. Union Pacific Railroad Co., 33,658, p. 6 (La.App. 2nd Cir.8/31/00), 766 So.2d 751, 756; Cooper v. Borden, Inc., 30,292, p. 2-3 (La.App. 2nd Cir.2/25/98), 709 So.2d 878, 881. An affirmative defense raises new matters that, assuming the allegations in the petition to be true, constitute a defense to the action and will have the effect of defeating plaintiff's demand on its merits. Johnsa v. Edwards, 582 So.2d 1280, 1283 (La.1991). The general purpose of the statute requiring that certain defenses be affirmatively pleaded is to give fair notice of the nature of the defense and thereby prevent last-minute surprises to plaintiff. Stockstill v. C.F. Industries, Inc., 94-2072, p. 6 (La .App. 1st Cir. 12/15/95), 665 So.2d 802, 810, writ denied, 96-0149 (La.3/15/96), 669 So.2d 428.
Failure to so plead an affirmative defense, however, does not automatically preclude the application of the defense in all cases. For example, La. C.C.P. art. 1154 provides that pleadings may be enlarged by evidence adduced without objection, even if such evidence concerns an affirmative defense not pled in the answer. Cooper, 709 So.2d at 881. For introduction of evidence to automatically enlarge the pleadings under La. C.C.P. art. 1154, the evidence admitted must not be pertinent to any other issue raised by the pleadings. If the evidence was admissible for any other purpose, it cannot enlarge the pleadings without the express consent of the opposing party. Bourque v. Koury, 95-286, p. 3 (La.App. 3rd Cir.11/2/95), 664 So.2d 553, 555.
An examination of two recent cases wherein the defense of federal preemption was urged is instructive. In Cooper, the issue of federal preemption was raised for the first time on appeal. Refusing to find that the pleadings had been enlarged to include such affirmative defense, the Second Circuit stated that at no time during the trial or by any pleading did Borden argue that it was immune from liability. Furthermore, in Cooper it was held that the brief mentioning of a federal regulation at trial was not sufficient to enlarge *573 the pleadings to incorporate the affirmative defense of federal preemption. Cooper, 709 So.2d at 881. To allow Borden to raise the issue for the first time on appeal would defeat the purpose of requiring the pleading of a special defense, i.e. to give plaintiffs fair and adequate notice of the nature of the defense.
By contrast, in Furlough Union Pacific raised the issue of federal preemption by motions filed more than five months prior to trial. The plaintiff vigorously contested the pre-trial motions asserting federal preemption. Finding that the plaintiffs had more than adequate notice well before trial that Union Pacific claimed immunity by virtue of federal preemption, the Second Circuit held that the failure to object constituted a waiver of any such objection. Furlough, 766 So.2d at 757. In the case sub judice, this record, comprising seven volumes and exceeding 1,700 pages, contains no pleading or any mention whatsoever of federal preemption.
Exceptors have failed to identify for us what evidence they contend was introduced at trial without objection which would be sufficient to constitute an enlargement of the pleadings so as to fairly raise the issue of federal preemption. We find no evidence was adduced at trial without objection sufficient to invoke the exception authorized by La. C.C.P. art. 1154, so as to permit the state to invoke two years post-trial the affirmative defense of federal preemption. We, therefore, deny the defendant's peremptory exception raising the objection of no cause of action based upon federal preemption. Accordingly, we pretermit any discussion of the merits of the issue of preemption.

APPELLATE STANDARD OF REVIEW
The jury's answer to the special interrogatory finding that the bridge rail over Jefferson Highway was unreasonably dangerous is a factual finding. Where unreasonable risk of harm is at issue, the standard of review to be employed by appellate courts is manifest error. Aucoin v. State Through DOTD, 97-1938, p. 4 (La.4/24/98), 712 So.2d 62, 65; Reed v. Wal-Mart Stores, Inc., 97-1174, p. 3 (La. 3/4/98), 708 So.2d 362, 364. The trial court's findings are reversible only when there is no reasonable basis for the conclusions, or they are clearly wrong. Aucoin, 712 So.2d at 65; Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
The court of appeal may not set aside a court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart. v. State Through DOTD, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The Louisiana Supreme Court has announced a two-part test for the reversal of a fact-finder's determination:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) The appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Stobart, 617 So.2d at 882; Mart, 505 So.2d at 1127.
This two-part test dictates that a reviewing court must do more than simply review the record for some evidence that supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Nevertheless, the issue to be resolved by a reviewing court is not whether the trier-of-fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. Stobart, 617 So.2d at 882-83; Housley v. Cerise, 579 So.2d 973, 976 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder's, reasonable evaluations of credibility and reasonable inferences *574 of fact should not be disturbed upon review where conflict exists in the testimony. Rosell, 549 So.2d at 844; Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La. 1978).
Where two permissible views of the evidence exists, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883; Housley, 579 So.2d at 976; Rosell, 549 So.2d at 845; Sistler, 558 So.2d at 1112. Credibility determinations, including the evaluation of expert testimony, are factual issues to be resolved by the trier-of-fact. Stobart, 617 So.2d at 882-83; Orea v. Scallan, 32,622, p. 4 (La.App. 2nd Cir.1/26/00), 750 So.2d 483, 488. The only issue in a tort case such as this that would be reviewed de novo by an appellate court would be the question of the existence of a duty. See Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993). Factual issues, including breach of duty, cause-in-fact, scope of protection and actual damages are all factual issues subject to the manifest error standard of review described above.

UNREASONABLE RISK OF HARM
In the instant matter, DOTD's liability is based on the defective condition of the bridge rail along the Jefferson Highway/I-12 overpass. Liability for injuries sustained as a result of a defective condition is based on legal fault, i.e. strict liability. See La. C.C. art. 2317.
In an action asserting liability under article 2317 before 1996,[2] the plaintiff bore the burden of proving three elements: (1) that the thing which caused the damages was in the care, custody, and control (garde) of the defendant; (2) that the thing had a vice, ruin, or defect that presented an unreasonable risk of harm; and (3) that the vice, ruin, or defect was the cause-in-fact of the plaintiff's damages. La. C.C. art. 2317; Sistler, 558 So.2d at 1112; Loescher v. Parr, 324 So.2d 441, 446-51 (La.1975). To recover, plaintiffs bear the burden of proving these elements in the affirmative, and the failure on any one is fatal to the case. Dupree v. City of New Orleans, 99-3651, p. 6 (La.9/1/00), 765 So.2d 1002, 1008.
The liability of DOTD to an injured plaintiff hinges on whether it has breached a duty to the plaintiff. Gibson v. State Through DOTD, 95-1418, p. 4 (La. App. 1st Cir.4/4/96), 674 So.2d 996, 1001; Hunter v. DOTD of State, 620 So.2d 1149, 1150 (La.1993). DOTD's duty is to maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. La. R.S. 48:21(A); Netecke v. State, Through DOTD, 98-1182, p. 7-8 (La.10/19/99), 747 So.2d 489, 494-95; Campbell v. Louisiana DOTD, 94-1052, p. 5-6 (La.1/17/95), 648 So.2d 898, 901-02. DOTD is required to adopt minimum safety standards regarding highway design, construction and maintenance, conforming to the standards approved by the American Association of State Highway and Transportation Officials (AASHTO) whenever possible. La. R.S. 48:35(A)(1). Design standards, both at the time of original construction and at the time of the accident, may be relevant factors in determining whether a given stretch of roadway presents an unreasonable risk of harm but are not determinative of the issue. Thornhill v. State Department of Transportation and Development, 95-1946, p. 6 (La.App. 1st Cir.6/28/96), 676 So.2d 799-801; Dill v. State Through DOTD, 545 So.2d 994, 996 (La.1989).
DOTD must maintain the shoulders and the area off the shoulders within its right-of-way in such condition *575 that they do not present an unreasonable risk of harm to motorists using the adjacent roadway and to others, such as pedestrians, who are using the area in a reasonably prudent manner. Netecke, 747 So.2d at 495; Brown v. Louisiana Indem. Co., 97-1344, p. 3 (La.3/4/98), 707 So.2d 1240, 1242; Oster v. Department of Transportation and Development, 582 So.2d 1285, 1289-91 (La.1991). This duty extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Netecke, 747 So.2d at 495.
Although DOTD has the duty to provide a safe highway shoulder and this duty encompasses the risk that a careless motorist might inadvertently stray off the paved surface and unexpectedly roll on to a negligently maintained shoulder, Wall v. Alleman, 519 So.2d 155, 157 (La.App. 2nd Cir.1987), writ denied, 521 So.2d 1171 (La. 1988), this duty does not extend to a motorist who has knowledge of the defect and a reasonable opportunity to avoid the harm. Orillion v. Carter, 93-1190, p. 5, (La.App. 1st Cir.6/24/94), 639 So.2d 461, 465, writ denied, 94-2289 (La.11/18/94), 646 So.2d 384; Sinitiere v. Lavergne, 391 So.2d 821, 826 (La.1980).
The duty of DOTD to maintain its public roadways in a reasonably safe condition without presenting unreasonable harm to the motoring public exercising ordinary care and reasonable prudence does not, however, render DOTD the guarantor for the safety of all the motoring public. Netecke v. State Through DOTD, 747 So.2d at 495; Graves v. Page, 96-2201, p. 12 (La.11/7/97), 703 So.2d 566, 571-72; Briggs v. Hartford Ins. Co., 532 So.2d 1154, 1156 (La.1988). Furthermore, DOTD is not the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway or its appurtenances. Netecke, 747 So.2d at 495. Moreover, not every imperfection or irregularity will give rise to liability, but only a condition that could reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Netecke, 747 So.2d at 495; Entrevia v. Hood, 427 So.2d 1146, 1149 (La. 1983). The existence of an unreasonable risk of harm may not be inferred solely from the fact that an accident occurred. Netecke, 747 So.2d at 495. Whether DOTD breached its duty to the public, by knowingly maintaining a defective or unreasonably dangerous roadway, depends on all the facts and circumstances determined on a case-by-case basis. Cormier, 748 So.2d at 1127; Netecke, 747 So.2d at 495; Campbell, 648 So.2d at 901-02; see also Hunter, 620 So.2d at 1151.
In the case sub judice, the jury answered affirmatively interrogatories that led to the ultimate jury verdict finding DOTD 90% at fault for the injuries to Snearl and Olinde. The jury determined: 1) that the bridge railing presented an unreasonable risk of harm; 2) that DOTD should have known of the unreasonable risk of harm; 3) that DOTD had a reasonable opportunity to remedy the unreasonable risk of harm; and 4) that risk was a proximate cause of the damages in question. Therefore, we presume that the jury concluded that the plaintiffs carried their burden of proof. See Netecke, 747 So.2d at 495. It is undisputed that DOTD had custody of the I-12 bridge over Jefferson Highway and the bridge rail in question. However, DOTD vigorously disputes that the bridge railing presented an unreasonable risk of harm. Accordingly, we will review the record regarding the bridge railing to determine if the jury's finding of the bridge railing to be unreasonably dangerous was manifestly erroneous or clearly wrong. Netecke, 747 So.2d at 495; Stobart, 617 So.2d at 882.
James R. Lock, plaintiffs' accident reconstructionist expert, testified that Frank was traveling 53 mph when he applied the brakes on the dump truck. The photo showing contact marks on the rail indicated that the vehicle slid 32 feet before it vaulted over the bridge railing. Lock concluded that when the truck tire made first *576 contact with the safety walk on the bridge railing, the truck climbed up on the walk rather than bounced off of it. He stated that Frank's brakes locked up and that 100 feet of skid marks were visible. He opined that the dump truck began to rotate with the back end starting to move out to the right in a fishtailing maneuver. Lock concluded that the angle of impact was 28° relative to the retaining wall and that, at the end of the skid, the dump truck had slowed to approximately 40 mph, and ultimately climbed over the retaining wall at approximately 31 mph.
Lock testified that the truck weight approximately 18,000 lbs. unloaded. He noted that the truck fell approximately 35 feet, which he likened to falling off of something higher than a 3-story building. Lock opined that the height of the fall was the principal reason for the severity of the damage. Lock was familiar with the report prepared for DOTD by Ned B. Walton, another accident reconstruction expert, wherein Walton concluded, inter alia, that the bridge railing that was originally designed was inadequate to contain and/or redirect the dump truck or similar vehicles at highway speed and at a relatively sharp angle.
Plaintiff elicited testimony from Gordon E. Nelson, district administrator for DOTD and formerly district maintenance engineer from 1990-1994. Nelson testified that the function of a bridge rail is to keep traffic from going over the bridge and within the travel lanes. The aluminum rail, which was part of the bridge barrier rail assembly in the subject accident, was purely for an aesthetic purpose, having nothing to do with providing a barrier. Nelson said the bridge rail is intended to send people on down the road if they make inadvertent contact with the rail. He testified that when the bridge was built, it was built to the design standards that existed at that time. Nelson stated it was up to the designers to insure that the designs are up to the current standards. Nelson also stated that normally bridges are upgraded on overlay jobs, but that the state was in no position financially to "retrofit everything anytime there is a change" made in design standards. Nelson testified that the drawing of plans occurs long before any concrete is poured, sometimes between one and three years; consequently, bridge features can be changed up until the time the bridge is actually built. However, once final design plans go out to the contractor, no changes are permitted.
As district maintenance engineer, Nelson was in charge of inspection of all highway bridges within the district. Nelson stated DOTD's bridge inspection is concerned with the general structural integrity of the bridge, looking for any damage such as holes in the deck, broken concrete sections, or missing sections of rail.
Gil M. Gautreaux, civil engineer and DOTD bridge maintenance engineer, reviewed several technical documents, including how bridge inspections were reported. He noted on one DOTD form an incorrect coding of safety features regarding the bridge railing in question. Gautreaux noted that, for the parapet wall bridge rail design, the bridge railing should have been coded "1" if the roadway's speed limit was 35 mph; otherwise, the inspectors should code the railing as "0." The form is an inventory of safety features required to be filled out by DOTD for federal funding. The five-mile bridge on U.S. Highway 11 over Lake Pontchartrain was an example that Gautreaux gave of a retrofit project performed by DOTD. That bridge was built in the 1920's.
Maurice E. Bronstad, a consulting registered civil engineer with experience in highway safety, roadside hazards, accident data analysis and crash testing, was accepted as an expert by the trial court in the field of bridge rail design. He was familiar with documents prepared by the American Association of State Highway and Transportation Officials (formerly the American Association of State Highway Officials) (AASHTO/AASHO) on geometric policy and bridge specifications, having *577 been a consultant to them for many years. Bronstad testified that each state belongs to AASHTO and participates in determining specifications for highway design, construction, and safety. The Federal Highway Administration (FHWA) works in concert with AASHTO in developing the specifications, which are later disseminated to the several states and become requirements. Bronstad testified that the federal government, through the Highway Safety Act of 1966, began to mandate the states to improve their roads and make them and the roadsides safer by explaining the roadside safety concept to mean that if something near the edge line of a road is going to be hit, it should be as forgiving as possible. Bronstad noted that most roadside accidents are single-vehicle accidents. Bronstad used the term "clear zone" to describe the area beginning at the edge line of the roadway, extending onto the shoulder and well beyond it. The clear zone needs to be "traversable" by vehicles running off the road so that they can regain control and get back on the road.
Bronstad testified that his research revealed that vehicular accident injuries were substantially enhanced when vehicles vault over a railing and land some distance below. In the bridge rail at issue herein, Bronstad testified that it was designed at a time when there was no relationship of the bridge rail design to actual vehicle impact.
Bronstad confirmed that the I-12 bridge rail over Jefferson Highway met AASHTO standards when it was designed, but by the time it was completed it did not meet the current standards. Bronstad testified that the bridge rail design was defective as of 1964, but that DOTD knew in 1961 that the criteria for the design of this bridge was disfavored by the Bureau of Public Roads (BPR), predecessor of the FHWA. Bronstad testified that the 1964 standard had very dramatic changes in bridge rail specifications, greatly increasing the structural and geometric requirements. For the Jefferson Highway bridge, the 1964 changes would have mandated increasing the height of the concrete wall from 18 inches to 27 inches above the safety walk. Bronstad further opined that the higher wall would have contained the dump truck, using calculations based on his impact severity equations.
A number of technical documents generated by AASHTO and BPR were introduced into evidence through the testimony of Bronstad. For example, Bronstad referred to the 1967 AASHTO Standard on Highway Design and Operation of Practices Related to Highways, commonly known as the "Yellow Book", as signifying the beginning of a big safety movement. Noted therein was this comment:
Many parapets are hazardous because of existing `safety walks', which allegedly cause vehicles to bounce over the parapet. Safety walks should be eliminated from future designs, and to the extent practicable[,] from existing bridges.
Similarly, in 1964, AASHTO's committee on bridges and structures developed interim specifications, which, among other things, recommended that, in cases where an existing safety wall exists, the parapet be raised from 18 inches to 27 inches.
Bronstad testified that the 1974 update of AASHTO's Yellow Book contained the following recommendation:
Bridge railing and parapets should be structurally adequate and a esthetically pleasing as well as designed to do a minimum of damage to a colliding vehicle and its passengers. A vehicle which strikes the railing or parapet should be redirected along the line of traffic, parallel to the railing or parapet ....
Many existing bridge railings do not meet current design requirements and cannot prevent penetration by a passenger vehicle under even moderate impact conditions. On high-speed, high-volume roads, strengthening of these railings should be given high priority in the State's safety program. Complete replacement of railings of obsolete design *578 is obviously expensive, and alternate solutions which utilize portions of the existing rail and anchorages should be considered....
Barrier curbs and safety walks along the faces of bridge parapets are undesirable as they may cause vehicles to go out of control and even to bounce over the parapet. In rural areas or where pedestrians are not present, safety walks should be eliminated from future designs, and to the extent practicable, from existing structures ....
Bronstad discussed the concept of retrofitting or placing a structure in front of the bridge rail that is structurally sound or by adding to it, to make a better system. He pointed to an exhibit showing an actual retrofit of a bridge rail where the railing was brought out to the face of the curb to lessen or eliminate the possibility of a launching effect of a vehicle over the barrier. According to Bronstad, federal funding has been available to the states for retrofitting projects since the 1970's.
A 1976 report to the FHWA evaluating railing systems over the United States was received into evidence. One of the systems studied was the safety walk system of the Lake Pontchartrain Causeway in Louisiana, which had developed a retrofit system after testing in 1975-76. Bronstad described the retrofit system as a "good economical retrofit" but that it was never utilized prior to the tragic accident herein. Bronstad referred to a 1973 AASHTO publication entitled "A Policy on Design of Urban Highway and Arterial Streets." Among the data contained in this publication is the following:
Highways should be designed so as to accommodate all drivers in relative safety, including reasonable provisions for those whose driving competence has been seriously impaired regardless of whether it is due to emotional problems, alcohol or other factors...
which would include momentary inattentiveness, according to Bronstad.
Documents submitted by the State of Louisiana showed that construction on the entire I-12 project started in 1963, with work on the Jefferson Highway bridge starting in 1964. The roadway and bridge were open to traffic in January 1967, with final inspection several months thereafter. In August of 1966, a request for a change order was issued to change the approach guardrails to the Jefferson Highway bridge, in order to bring it up to current standards. There was no change made to bring the bridge rail up to then-existing design standards.
Bronstad testified that he was personally aware that a grooving project was undertaken on I-12 in the 1980's. Grooving is the technique used to affect the surface of the roadway so as to eliminate or minimize hydroplaning and skidding in wet weather. The process is customarily done by closing one lane of the highway at a time. Bronstad testified that this could have provided an opportunity to fix the bridge rail at the same time.
Finally, Bronstad testified that the retrofit designs, examples of which were introduced into evidence, if used on the Jefferson Highway bridge, would have prevented the accident.
On cross-examination, Bronstad conceded that the Jefferson Highway I-12 bridge was designed and built in conformity with the standards in effect in the 1954 "Blue Book" policy on geometric design on rural highways. This policy was continued in the 1957 "Red Book," which standards continued to remain in effect until at least 1961. The code requirements had been in effect or detailed in a 1959 memorandum from the Commissioner of Public Roads to the regional and division engineers. This memorandum authorized curbs of 12 inches in height, provided there existed a normal 2 foot offset from the edge of the traffic lane. The memorandum further directed that all future federal-aided projects incorporate into their design the use of a reinforced concrete parapet in combination with a metal hand railing. The *579 parapet should be 18 inches when used with a curb and 27 inches where no curb was used. Bronstad testified that the I-12 bridge was built in accordance with the 1959 memorandum.
Bronstad conceded that the April 1962 memo proposing raising the height of the bridge rail 9 inches above the safety walk was only a proposal and not a required specification. This proposal became a specification when confirmed by AASHTO ballot in November of 1964, according to Bronstad. He further conceded that the states were not required to act on interim specifications. Bronstad stated that while retrofitting of deficient bridge rails has never been a requirement imposed on the state, the state was encouraged to eliminate the former design. Finally, Bronstad conceded that there was a great deal of difference in the design and construction of an approach guard rail and that of the bridge rail itself, as retrofitting or redesigning an approach guard rail is not a major construction as it would be with a bridge rail. He characterized grooving as a relatively minor procedure that can be completed fairly quickly. Bronstad further noted, however, that retrofitting a bridge railing does not take long "if you are ready to do it."
The defense presented evidence through several current and retired officials of DOTD as well as the original design engineer for the Baton Rouge Interstate System. Hossein Ghara, a civil engineer and DOTD design administrator, testified that he oversaw the design program, had participated in crash testing of bridge rails, and had designed bridge rails. Ghara testified that, although the original design of the Jefferson Highway bridge rail did not meet AASHTO standards at the time of the accident in 1994, it did however, comply fully with 1961 AASHTO bridge specifications in effect when it was designed in 1962. He stated that DOTD was not required or expected to upgrade bridge rails to meet changing standards unless there was major reconstruction to the bridge. No major reconstruction of that section of I-12 would have required DOTD to upgrade the rails, according to Ghara. Moreover, at the time of the accident, DOTD already had plans in effect to raise the bridge grade, add shoulders on both sides of the bridge and incorporate the newest approved bridge rails at the site of the accident. Ghara testified that this section of the road was well-maintained and that there was no showing that any lack of repair to the bridge or its railings caused the accident.
William B. Conway, a civil engineer and principal of Modeski and Masters, designer of the I-10 and I-12 interstate systems in and around Baton Rouge, identified several documents, including the "as-built" plans for the I-12 bridge and the construction specifications for the bridge. He confirmed that the bridge was designed in accordance with the 1961 AASHTO bridge specifications and that this bridge rail design was used throughout the State of Louisiana and in at least three other states that his firm was then doing business with. Conway believes that he received the 1965 AASHTO bridge design specifications in the late spring of 1966 and did nothing in regard to the change of the design of this bridge when he received them, as there was no requirement to upgrade the bridge structure upon receiving new standards.
On cross-examination, Conway testified that his firm engineered a retrofit of I-10 in Baton Rouge from the City Park area to College Drive in the mid-1970's by installing a concrete barrier as a safety improvement. When asked if DOTD could have changed the design of the bridge rail at any time prior to the bridge's opening, Conway stated that it was possible but that there was a bias against it, with the state having a brand-new structure built in accordance with "the most modern standards of the day".
William Hickey, retired chief design engineer for DOTD, testified that DOTD followed AASHO and AASHTO guidelines in all design activities. Hickey served as a *580 member of an AASHTO sub-committee on design for approximately ten years. Hickey concurred with Bronstad that the bridge rails are considered part of the clear zone of a highway. According to Hickey, once new AASHTO guidelines are published, DOTD would then modify design standards to incorporate their recommendations into any future projects. Hickey testified that in the early 1990's as part of a highway overlay program, DOTD designed a special retrofit for guardrails that went all the way across the bridge and blocked the rail out, to the edge of the face of the curb, thereby eliminating the safety walk. This became necessary because overlaying decreases the height of the curb when several inches of concrete are added upon the original decking. Hickey testified that there are hundreds of miles of bridge rail on the Interstate System in south Louisiana that would have to be retrofitted in order to meet the current standards. He conceded that the state had the opportunity to retrofit the Jefferson Highway bridge prior to the accident, but that there were no projects approved to do so. While stating that DOTD corrected those situations involving deficient design every time it had a major project involving reconstructing a roadway, he conceded that there was no program with respect to eliminating safety walks until the 1990's.
Neilon J. Rowan, professor emeritus of civil engineering at Texas A & M University and consulting engineer, was accepted by the trial court as an expert witness for the defense in the fields of highway design and roadside safety and barriers. Rowan, likewise, confirmed that the geometric configuration of Conway's bridge design conformed to the 1961 AASHTO bridge design standards and that the 1965 AASHO bridge specifications did not require DOTD to change the bridge design to conform to the new standards, nor did the 1967 AASHO report require reconstruction.
The thrust of the plaintiffs' case can be summarized as follows: at the time the original bridge design was approved, DOTD had significant information in its possession that indicated potential dangers with the design. The bridge rail design was three years obsolete on the day the bridge opened. In addition, DOTD knew that the safety walk and parapet combination tends to bounce vehicles over the railing with the safety walk acting as a stepping mechanism. Further, once the vehicle is up on the curb of the bridge, the parapet is too short and acts as another step-over. Although AASHTO and the federal government have urged elimination of safety walks from existing structures and has promised funding assistance, the Jefferson Highway bridge rail was not upgraded.
The state established that the bridge rail in question, when designed, was approved by the FHWA and was constructed in accordance with its original design. Moreover, DOTD was not required or expected to upgrade bridge rails to meet changing standards unless there was major reconstruction. The cost to the state would be prohibitive to replace thousands of miles of bridge railing that are now known to have been deficiently designed.
The trial jury was presented with two differing but permissible views of the evidence. We find that there is adequate evidence in the record to support the jury's conclusion that the bridge railing over Jefferson Highway on I-12 presented an unreasonable risk of harm to the plaintiffs. Where two permissible views of the evidence exists, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883; Rosell, 549 So.2d at 844. Even if the appellate court feels that its own evaluations and inferences are more reasonable, the fact-finder's choice between two permissible views of that evidence cannot be clearly wrong. Cormier, 748 So.2d at 1127. We, therefore, affirm the jury's *581 findings that the bridge rail presented an unreasonable risk of harm.

CAUSE-IN-FACT
We also review the jury's findings relative to the issue of causation: was the bridge railing, which the jury found to have created an unreasonable risk of harm, a cause-in-fact of the plaintiffs' injuries? See Netecke, 747 So.2d at 497-98. Causation can be proved in many ways. If defendant's conduct was a substantial factor in bringing about harm, then it is a cause-in-fact of the tort victim's injuries, while a causal connection also exists when plaintiff would not have suffered damages "but for" defendant's substandard conduct, and in short, if the tort-feasor's actions had something to do with injuries sustained, then a causal relationship sufficient to allow recovery exists. Cay v. State, Department of Transportation and Development, 93-0887, p. 5 (La.1/14/94), 631 So.2d 393, 395-96; see also, Fowler v. Roberts, 556 So.2d 1, 5-6 (La.1989).
We find that DOTD's argument is similar to that raised and rejected by us in Simpson v. State Through DOTD, 636 So.2d 608 (La.App. 1st Cir.1993). In Simpson, we noted that the Supreme Court in Socorro v. City of New Orleans, 579 So.2d 931 (La.1991), and in Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La. 1988), explained that the defendant's duty is not to be defined in terms of the plaintiff's conduct. We stated in Simpson, 636 So.2d at 612:
Likewise ... DOTD attempts to define causation solely by plaintiff's action, without consideration of the simultaneous causation resulting from defendant's inaction. DOTD seeks to achieve the same result that would be reached if contributory negligence were still a bar to recovery of damages under Louisiana law.
See also Lang v. Prince, 447 So.2d 1112 (La.App. 1st Cir.1984), writs denied, 450 So.2d 1309 (La.1984), 450 So.2d 1311 (La. 1984). In Lang, the guest passengers were killed when the driver of a pickup truck left the roadway and struck a utility pole located in the middle of an improved highway shoulder. DOTD urged on appeal that the driver's fault relieved DOTD of liability. Noting that the critical issue was whether the pole at its location on the shoulder created an unreasonable risk of injury, we held that the driver's negligence was not an intervening cause that would relieve the DOTD from liability. Lang, 447 So.2d at 1117.
DOTD contends that because Frank breached his duty to maintain control of his vehicle, the accident would not have occurred but for Frank's inattentive driving. DOTD argues that virtually all fault should be assessed against Frank. Said another way, DOTD asserts Frank's negligent driving was the cause-in-fact of Snearl's and Olinde's injuries. We note that a similar contention was raised in the case of Williams v. City of Monroe, 27,065 (La.App. 2nd Cir.7/3/95), 658 So.2d 820, writ denied, 95-1998 (La.12/15/95), 664 So.2d 451. In that case, the decedent, Ms. Watson, was traveling on the DeSiard Street Bridge over the Ouachita River. For some unknown reason, Ms. Watson lost control of her vehicle, which climbed up on a barrier curb constructed by DOTD as part of planned improvements to the DeSiard Street bridge. As in the case at bar, Ms. Watson's vehicle eventually vaulted over the bridge railing, falling to the river bank below, killing Ms. Watson instantly and injuring several minor children in her vehicle. The Second Circuit noted that "but for:"
Ms. Watson's conduct in straying from her lane, the accident would not have happened. Ms. Watson might have never encountered the unreasonable risk of harm created by the defendants if she had not been negligent.
Although we feel that Ms. Watson's conduct was an equally contributing cause of the harm suffered as a result of the accident, we cannot substitute our *582 own evaluations for those of the trial court when the trial court's evaluations are reasonable.
Williams, 658 So.2d at 830-31.
The trial judge in Williams found that the fault of DOTD and the City of Monroe combined with the fault of Ms. Watson was the cause-in-fact of the harm suffered.
In Gibson v. State Through DOTD, 95-1418, p. 2 (La.4/4/96), 674 So.2d 996, 999, the plaintiff's vehicle left the roadway, impacted a concrete bridge cap adjacent to the roadway, flipped, and ignited. The plaintiff burned to death. DOTD asserted that because it did nothing to cause Gibson to leave the roadway, it should be found free from fault. It contended that the placement of the bridge cap was not the cause-in-fact of the resulting harm to Gibson. However, the court found that the failure of Gibson to maintain control of his vehicle did not relieve DOTD of its duty to keep the highway safe. Gibson, 674 So.2d at 1003, citing Campbell v. Louisiana Through DOTD, 94-1052 (La.1/17/95), 648 So.2d 898. The Supreme Court found that the negligence of Gibson in losing control of his vehicle, as well as DOTD's placement of the concrete bridge cap combined to cause the harm to Gibson. The fact that more than one party can contribute to the harm is the reason for our comparative fault system. See Campbell, 648 So.2d at 902. The court stated further in Gibson:
Except to the extent Gibson's negligence set the accident in motion, he had no control over the resulting harm caused by the impact with the concrete bridge cap.... [Each of the investigating law enforcement officers] explained that while damage to the vehicle could be expected, usually the driver would not be seriously injured.
Gibson, 674 So.2d at 1005.
We cannot state that the jury was clearly wrong in determining that the I-12 bridge railing over Jefferson Highway was the cause-in-fact of the harm suffered by Snearl and Olinde. All of the experts testified that the purpose of a bridge rail is to contain vehicles on the roadway. The undisputed evidence is that Frank's vehicle went out of control, struck and traveled down the bridge rail, vaulted over the rail, and then fell to the creek below. The jury evidently concluded that the bridge rail's failure to contain the dump truck on the roadway was a substantial factor in bringing about plaintiffs' harm. A reasonable basis in the record exists for the jury's findings, which are not clearly erroneous. This assignment has no merit.

APPORTIONMENT OF FAULT BETWEEN FRANK AND DOTD
DOTD next contends that, even if it was at fault, DOTD should not be allocated more than 10% of liability for this accident. The allocation of fault between comparatively negligent parties is a finding of fact. Sims v. State Farm Automobile Ins. Co., 98-1613, p. 2 (La.3/2/99), 731 So.2d 197, 199. If the court of appeal finds an apportionment of fault by the trial court clearly erroneous, it should raise or lower it to the highest or lowest point reasonably within the trial court's discretion. Clement v. Frey, 95-1119, p. 7-8 (La.1/16/96), 666 So.2d 607, 611; Leatherman v. Riverside Village, 95-2227, p. 4 (La.App. 1st Cir.6/28/96), 676 So.2d 1180, 1183. DOTD urges the court to raise the allocation of fault to at least 90%, contending that is the minimum percentage of fault allocable to a grossly negligent driver such as Frank.
The evidence established at trial shows that Frank lost control of the dump truck and engaged in an erratic maneuver, which began when he evidently took his eyes off the road. Two witnesses testified at trial that Olinde told them after the accident that the reason Frank lost control of the dump truck was because he was looking out of his window at a female in a vehicle to the left of the truck. These witnesses were Gary Mercer, of Mercer Construction, *583 and Mark McInnis, who helped save Olinde's life. These conversations took place several weeks after the accident. While some of this testimony is somewhat unreliable due to the fact that Olinde was highly medicated at the time the conversations took place, the reason for Frank's manifest inattention is immaterial. The fact remains that he lost control of the dump truck because of momentary inattentiveness, which could have just as easily happened if he was trying to light a cigarette, retrieving items from the glove box or off of the floor, engaging in conversation with passengers, or for any number of other reasons. Frank clearly did not discharge his duty to maintain control of his vehicle. Frank was responsible not only for his own safety but for that of his two fellow employees, and he must share some responsibility for the harm suffered.
The factors to be considered in determining the allocation of the percentage of fault as between the parties include:
1) Whether the conduct resulted from inadvertence or involved in awareness of danger;
2) How great a risk was created by the conduct;
3) The significance of what was sought by the conduct;
4) The capacities of the actor, whether superior or inferior; and
5) Any extenuating circumstances that might require the actor to proceed without proper care.
Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967, 974 (La.1985). Furthermore, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. Mart, 505 So.2d at 1123; Watson, 469 So.2d at 974.
DOTD correctly argues that Frank's conduct, in losing control of his vehicle as a result of inadvertence, whether caused by inattention or by foolishness, created significant risk to Frank, his passengers and other motorists on I-12. The moment of inattention resulting in Frank losing control of his vehicle did not achieve any social utility for Frank or his passengers. Frank was in a superior position to that of the plaintiffs herein, in that he alone controlled the dump truck. On the other hand, there is no showing that either Frank or his passengers had any idea of the magnitude of the risk posed by the dump truck climbing up on the safety walk of the bridge rail.
In Simpson v. State Through DOTD, 636 So.2d 608 (La.App. 1st Cir.1993), the trial court found no fault on the part of the plaintiff driver whose brakes locked up when he applied them reflexively in a sudden down pour, resulting in fishtailing and loss of control. The truck slid at an angle perpendicular to the roadway with the driver's side of the cab striking a bridge railing at a 90~ angle. In that case, we concluded that the driver should be allocated 50% of the fault of the accident with the remaining 50% to DOTD, finding 50% to be the highest degree of fault a reasonable fact-finder could have found for DOTD. Simpson, 636 So.2d at 614.
In Williams, 658 So.2d at 830-31, the closest case found paralleling the specific factual situation at bar, the Second Circuit affirmed the trial court's findings wherein the driver was assessed with 33% of fault, DOTD and the City of Monroe with the remaining 67%.
In Gibson, 674 So.2d at 1000, a one-vehicle accident, the trial court assessed fault in the amount of 2/3 to DOTD and 1/3 to the driver, wherein the driver left the roadway, impacted a concrete bridge cap adjacent to the roadway, flipped and ignited. In that case, as in this matter, the driver burned to death as a result. We further noted in Gibson:
If we analyzed the fault of the parties in causing the harm to Gibson, then it is clear that the greater degree of fault lies with DOTD .... When considering the fault of the parties in causing the harm *584 to a plaintiff, the trier-of-fact must consider both the nature of the conduct of each party and the extent of the causal relation between the conduct and the damages claimed (i.e., the harm) as discussed in Watson and Campbell....
Except to the extent Gibson's negligence set the accident in motion, he had no control of the resulting harm caused by the impact with the concrete bridge cap. (Emphasis in original omitted).
Gibson, 674 So.2d at 1005.
We have noted that the trier-of-fact is owed deference in allocating fault, for the percentages of fault, pursuant to the comparative article, La. C.C. art. 2323, is a factual determination. Farley v. State Through DOTD, 95-2473, p. 6 (La.App. 1st Cir.9/27/96), 680 So.2d 746, 749. However, we are constrained to conclude that the jury was clearly wrong in allocating only 10% fault to the driver of the dump truck. We, therefore, raise the fault allocated to Frank to 35%, which we believe to be the lowest degree of fault that the trial court could have reasonably allocated to Frank under the facts and circumstances of this case.

TRIAL COURT REALLOCATION OF FAULT
In its third assignment of error, DOTD asserts legal error when the trial court reallocated the 10% fault the jury assigned to Frank, holding DOTD responsible for 100% of the damages. On questions of law, we need not accord any special weight to the trial court's findings but are empowered to review legal issues de novo and render judgment on the record. Gonzales v. Xerox Corporation, 320 So.2d 163, 165 (La.1975); Franklin and Moore v. Gilsbar, Inc., 95-1520, p. 4 (La. App. 1st Cir.5/10/96), 673 So.2d 658, 660.
The jury in this case was required to determine the percentages of fault attributable to each person whether or not a party. Bell v. Ayio, 97-0534, p. 4 (La.App. 1st Cir.11/13/98), 731 So.2d 893, 897. La. C.C. art. 2323(A) provides, in part:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
In the case before us, Frank was the plaintiffs' co-employee and is statutorily immune from judgment. See La. R.S. 23:1032. Nonetheless, DOTD contends that statutory immunity does not mandate the co-employee's percentage of fault to be imputed to DOTD, urging application of the 1996 amendments to Civil Code articles 2323 and 2324, as well as article 1812 of the Louisiana Code of Civil Procedure. Article 2323 was last amended in 1996, effective April 16, 1996, and requires the quantification of fault of all parties causing or contributing to the loss. This amendment has been held by our Supreme Court to be procedural, and thus may be applied retroactively to causes of action arising before its effective date. Keith v. United States Fidelity and Guaranty Co., 96-2075, p. 7 (La.5/9/97), 694 So.2d 180, 183.
Civil Code article 2324, as amended in 1996, now provides, in pertinent part:
A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to paragraph A, then liability for damages caused by two or more persons shall be a joint and indivisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the *585 person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
Unlike Civil Code article 2323, with retroactive application, the Supreme Court has determined article 2324(B) to be applicable prospectively only. Aucoin v. DOTD, 97-938, p. 10 (La.4/24/98), 712 So.2d 62, 67. Sub-part B of article 2324, in effect from 1987 until 1996, provided:
B. If liability is not solidary pursuant to paragraph A, or is otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover 50% of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the proceeding article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this article, all parties shall enjoy their respective rights of indemnity and contribution. Except as described in paragraph A of this article, or as otherwise provided by law, and hereinabove, the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other persons insolvency, ability to pay, degree of fault, or immunity by statute or otherwise.
DOTD's basic position is that once the fault of an immune party has been quantified, as herein done by the jury and fixed in the amount of 10%, no other responsible party should be forced to pay for that portion of the damages. It is urged in brief that Civil Code articles 2323 and 2324, as amended both in 1987 and 1996, demonstrate a clear legislative intent of pure comparative fault whereby a party would be liable only for his own share of fault. This issue has been raised on several occasions but has failed to yield an unequivocal pronouncement by our Supreme Court.
Snearl concedes that if the accident had occurred after the 1996 amendments, DOTD would only be liable for 90% of the damages when found to be 90% at fault. However, this accident occurred prior to the 1996 amendments. In Gauthier v. O'Brien, 618 So.2d 825, 825-29 (La.1993), the Supreme Court held that employer fault must be assessed in order to appropriately assess the fault of the third party tortfeasors, even though the employer would be statutorily immune from liability. According to the Gauthier approach "a fault attributable to the immune employer is reallocated among all other blame-worthy parties in proportion to their fault." See Gauthier, 618 So.2d 825 at 828-29. To hold otherwise would subject third party tortfeasors to pay damages in excess of their virile shares, contrary to Civil Code article 2324(B). In the case of co-tortfeasors, a third party responsibility for damages must be reduced by the immune party's degree of fault.
Two years later, Gauthier was overruled by Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496, p. 12 (La.6/30/95), 657 So.2d 975, 983. In Cavalier, 657 So.2d at 984, the Supreme Court held that quantification of employer fault is neither necessary nor appropriate under La. C.C.P. art. 1812 or the then current version of La. C.C. art. 2324. Perhaps in response to the Supreme Court's holding, the aforesaid amendments to articles 2323 and 2324 were enacted to require the determination of employer fault, notwithstanding any possible employer immunity. Thereafter, in Keith, 694 So.2d at 183, the court determined the effect of the amendments to *586 article 2323 and held it to be procedural in nature, and thus subject to retroactive application. The court declined to rule on the issue of whether quantification of the employer's fault can be used to reduce the amount of the plaintiffs' recoverable damages. See Keith, 694 So.2d at 184 (Calegaro, C.J., concurring). In Aucoin, 712 So.2d at 67, the Supreme Court held that since the amendment to article 2324(B) resulted in changing the amount of damages that either party could recover, the change was clearly substantive and should be applied prospectively only.
Another panel of this court had occasion to consider the issue of quantification of employer fault. In Grayson v. Ammon & Associates, Inc., 99-2597 (La.App. 1st Cir.11/3/00), 778 So.2d 1, a workplace accident resulted in serious injuries to a crane operator. Grayson suffered injury as a result of being struck in the head by an object released from a crane operating nearby. The crane was being operated by an employee of a temporary personnel agency, which was engaged in the business of providing temporary laborers to various employers, including Grayson's employer, Southern Scrap. The temporary employer appealed, asserting that the trial court erred in failing to reduce plaintiffs recovery by the percentage of fault attributable to plaintiff's employer. As in the case sub judice, Grayson's injury occurred in 1995, prior to the 1996 amendments to article 2324. The trial court ruled that the 1996 amendments to article 2324 could not be applied retroactively, per Aucoin, 712 So.2d at 67, and applied the ratio approach authorized by Gauthier, which was the applicable law at the time of Grayson's accident Grayson, 778 So.2d at 19. The result was to reallocate the fault of Southern Scrap to the temporary employer. As in the instant case, the plaintiff was found to be entirely free from fault in causing the accident. Noting that similar results had been found by the Fourth Circuit in Johnson v. Rogers and Phillips, Inc., 99-0116, p. 1-2 (La.App. 4th Cir.7/21/99), 753 So.2d 286, 295-96, on rehearing, as well as the Fifth Circuit in Lacrouts v. Future Abrasives, Inc., 99-583, p. 10 (La.App. 5th Cir.11/10/99), 750 So.2d 1063, 1058-69, writ denied, 99-3484 (La.2/11/00), 754 So.2d 941, we found no error in the trial court's determination that plaintiffs employer's fault should be reallocated to the temporary employer, the other culpable party. "Thus, applying Gauthier, the trial court was correct in refusing to reduce plaintiffs recovery by the percentage of fault of Southern Scrap." Grayson, 778 So.2d at 19.
We, therefore, find this line of jurisprudence to be controlling. The accident injuring Snearl and Olinde occurred in 1994, well prior to the amendments to Civil Code articles 2323 and 2324. We apply the law as it existed, following the Supreme Court's decision in Gauthier, 618 So.2d at 833. The fault attributable to Snearl's and Olinde's co-employee, Frank, must be reallocated to the other culpable party, DOTD, rather than reduce plaintiffs' recovery by the fault attributable to Frank. Accordingly, we do not find that the trial court committed legal error by allocating the fault attributable to Frank to DOTD. This assignment has no merit.

ALLEGED PREJUDICIAL TESTIMONY OF OLINDE
Next, DOTD claims reversible error due to an evidentiary ruling made by the trial court. DOTD contends that the evidentiary error interdicted the jury's finding of liability and requires this court to review the record de novo rather than affording the verdict deference under the manifest error rule.
At issue are two specific questions asked of Olinde. First, Olinde was asked:
Q. Did you have any idea before you went over this particular stretch of road that those bridge rails that I referred to just a second ago, because of their design that they were defective?
*587 DOTD timely objected on the grounds that the question assumed a fact not in evidence, was leading, and asked for an opinion that the witness was not qualified to supply. The trial court overruled the objection of DOTD; the question was repeated and answered in the negative. Then, Olinde was questioned further, as follows:
Q. If you had that knowledge, sir, that we are talking about, about that defective bridge rail, would you have wanted to cross that?
Again, the trial court overruled DOTD's timely objection and permitted Olinde to respond, which he did in the negative.
We agree that the questions were improper because they did, in fact, assume as fact the plaintiff's lay opinion that the bridge rail was defective. This issue was a question of fact for the jury to determine. However, we disagree that the questions called for the lay witness to render an expert opinion. The questions sought to determine whether Olinde would have traveled across the bridge had he known that the bridge rail was arguably defective. The questions were improper, self-serving and did not assist the jury in understanding evidence that it would not otherwise comprehend. However, apart from these two single questions addressed to Olinde, there was abundant other evidence adduced at trial that could have led the jury to reasonably conclude that the bridge rail presented an unreasonable risk of harm. We cannot conclude that the jury necessarily assumed that the bridge rail was conclusively shown to be defective solely through these two questions. The jury was presented with alternative hypotheses from experts that spoke directly to the ultimate fact issue in the case, namely whether the bridge rail on the I-12 overpass at Jefferson Highway presented an unreasonable risk of harm. We find harmless any error in the trial court's ruling concerning the testimony by Olinde. This assignment has no merit.

QUANTUM AWARDS
The defendant's final assignment of error concerns the damage awards to Snearl and Olinde. The trier of fact has vast discretion in awarding damages to a plaintiff. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). We are charged with first examining the plaintiffs' particular injuries and their effects on them. Only if the facts reveal an abuse of the vast discretion afforded the finder of fact, and the reviewing court then states the reasons for the excessiveness of the award, do we look to prior cases to determine appropriate damages and then only to lower the award to the highest reasonable amount. Reck v. Stevens, 373 So.2d 498, 500 (La.1979); Patin v. Duplessis PontiacBuickGMC Trucks, Inc., 632 So.2d 790, 793 (La.App. 1st Cir.1993).

A. Award to Olinde
DOTD does not take issue with the awards of $151,145.38 for past medical expenses, $25,000.00 for future medical costs or $119,099.99 for future impairment of earnings. Rather, DOTD contends that the award of $815,000 in general damages is excessive. Without question, Olinde suffered a terrible crushing injury as a result of a terrifying, unexpected fall of over 30 feet while trapped in his employer's dump truck. A fire broke out, resulting in the death of his friend and driver of the truck, Frank, as well as the horrifying and catastrophic injuries suffered by Snearl. Specific physical injuries suffered by Olinde include a broken left pelvic bone and left arm, a broken nose, a crushed chest, moderate burns and multiply abrasions. Olinde spent four months in the hospital before being discharged and spent some portion of that time in critical condition. Olinde had to return to the hospital to undergo shoulder surgery, followed by several months of recuperation and then surgery on his hand. Dr. Bankston, his treating physician, believed that Dalton Olinde's *588 most severe injury was the fractured pelvic bone. Dr. Bankston testified that Olinde suffered life-threatened injuries and spent his first 17-days in the hospital in the intensive care unit in major pain.
The impact from the fall within the truck onto the embankment caused Olinde to suffer fractured ribs and a collapsed lung, requiring the use of a chest-tube. He suffered significant bleeding problems while hospitalized. Hip replacement surgery will be necessary in the future because of the fractured pelvis. Because of Olinde's age (he is now over 60) the healing process has been only partly successful. He will suffer persistent pain and degenerative arthritis as a result of the trauma. He is precluded from ever performing heavy labor in the future. While it is not altogether clear that Olinde will need to use a cane for the remainder of his life, the hip surgery and resultant limitations indicate that his mobility will be significantly affected.
Olinde suffered a burn injury to his head and left eye and surgery was necessary because of his burns. His vision was adversely affected for many days after the accident. The major injuries resulting in broken bones required intervention with rods, pins and plates. Olinde has suffered a loss of fine motor skills, indicated by his inability to pick up small things with his hands, such as coins. He is unable to tie his shoelaces or button the top buttons of his shirt because of the inability to raise his arm high enough.
Several lay witnesses including his employer, Gary T. Mercer, and Guy Duke, Jr., testified as to the changes in Olinde's personality as a result of the accident. The record indicates that before the accident he was in good physical health and was a hard worker of great vitality. He now suffers significant depression, which Stephanie P. Chalfin, a rehabilitation expert, attributed to guilt he feels as being the "lucky one" involved in the accident. Chalfin elaborated that compounding Olinde's difficulties is his functional illiteracy, which will preclude him from returning to any gainful employment. This is obviously an important and saddening development for Olinde, who had enjoyed a fairly productive career in manual labor, for which he was qualified by virtue of his age, intellect, education and pre-accident physical abilities.
Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. We find the cases cited by the DOTD to be inapposite to the gruesome injuries suffered by Olinde in the harrowing accident of November 16, 1994. We find that Olinde has suffered extraordinary mental anguish from this accident, which has manifested itself in periodic nightmares, recurring visions of his friend Frank burning to death alongside him while trapped helplessly in the cab of the dump truck. This accident and the resulting injuries have effectively ended a major life activity for this simple man. Further, considering the additional medical problems he is likely to experience in the future as he continues to age and his bones experience increased frailty, we cannot say that the jury abused its vast discretion in making the admittedly generous awards of general damages. It cannot be shown that the awards are the result of passion or prejudice against the DOTD, and the awards of general damages bear a reasonable relationship to the elements of the proved damages. Youn, 623 So.2d at 1261. We, therefore, decline to find an abuse of discretion and, accordingly are precluded by standards of appellate review from adjusting the award of general damages, although other rational triers of fact could have decided that lower *589 awards would be more appropriate in this case.

B. Award to Snearl
The total award to Snearl exceeded $9 million. The two aspects of the award that DOTD contends are excessive and an abuse of jury discretion are the $5 million awarded in general damages ($1 million each for pain and suffering, mental pain and anguish, loss of enjoyment of life, permanent disability and permanent disfigurement), and $3.3 million for future medical costs and life care.

1. General damage award of $5 million
Snearl was 22 years old at the time of the accident. He received severe and profound injuries after being trapped in the burning vehicle. Medical evidence showed that he suffered massive burn injuries to his leg and pelvic area, including the genitals. His treating physician, Dr. Hargroder, described Snearl's burn wounds as the deepest thermal burns he had ever seen. Specifically, he suffered extensive third and fourth-degree burns to his legs, penis, scrotum, buttocks, perenial area and parts of his left arm. Both of his legs were amputated beneath the buttocks crease. He withstood multiple skin grafts, a colostomy, penectomy with pallostocy and urethrostomy, removal of the right testicle and a portion of the scrotum. A ruptured spleen required exploratory laparotomy and a spleenectomy.
Following his acute hospitalization, Snearl underwent micro-surgical folic reconstruction, which included extensive work on the genito-urinary system. Some two years post-accident, an innovative procedure was performed on Snearl whereby a new penis and urethra were fashioned out of his forearm. However, the new penis has only limited sensation. He needs to urinate frequently, but urination is much more uncomfortable.
The lower extremities were so severely burned that they were described as having exposed and burned bone, essentially skeletinized lower extremities below the knee. The burns extended up into the inguinal area and the buttocks and there were third and fourth-degree burns to the scrotum and penis. His abdomen suffered second-degree burns. The wounds were ultimately determined to be 51% of his total body surface.
Snearl underwent lengthy and painful skin debridement procedures, occurring twice a day for several weeks. Snearl's entire back was used as a donor site for permanent skin grafts after successful testing procedures. Numerous skin grafts are evident from the scaring on his back. His forearm is indented and covered with scar tissue where skin and muscle were removed in order to construct a new penis.
Snearl is confined to a wheelchair for the remainder of his life, as his leg stumps are too short to support prosthesis. Even though this trial was some four years after the accident, Snearl still suffers from daily headaches, phantom pains, increased sweating, especially during sleep, and pronounced heat intolerance. He weighed 150 pounds at the time of trial, in stark contrast to the 205 pounds he weighed on the day of the accident.
The moments immediately following the accident were extremely traumatic and horrifying. The record reflects that Snearl heard Olinde scream and beg for help while Frank burned to death while sitting right next to him. Snearl then became aware of the fire, which began at his own toes and then slowly consumed his entire lower body.
After the accident, Snearl was transferred by helicopter to Baton Rouge General Medical Center where he was intubated and received blood transfusions. The bilateral amputations and spleenectomy occurred on the day of admission. A total of seven surgical procedures were undertaken on Snearl during the initial hospitalization. Among these included a diverting colostomy, which became necessary as his burn wounds healed. The colostomy reversal *590 procedure was performed in May of 1995, although the said supra-pubic tube remained until June 1995.
Considering the foregoing, and the record as a whole, and mindful of the principles which govern our review of this matter, we are unable to say that the jury abused its discretion in its award of general damages herein. Although the award is on the high side, we are unable to say it is abusively so, considering the significance of the injuries sustained and their profound and detrimental impact upon this plaintiff's life.

2. Future Medical Costs and Future Life Care Award of $3.3 million
DOTD contends the jury award of $3.3 million for Snearl's future medical care and life care plan is an abuse of discretion. DOTD argues in brief that the only evidence regarding this item was presented through the report of Robert Voogt, who prepared a life care plan for Snearl. Voogt's comprehensive report, submitted into evidence, was offered in lieu of his live testimony. No opposing life care plan was presented by the defense, nor were any portions of Voogt's prior discovery deposition testimony offered into evidence. Voogt reviewed many medical reports prepared by the various providers who treated Snearl, including Dr. Thomas Wills, Dr. Andrew Hargroder, Dr. Brian Bourgeois, rehabilitation physician Dr. John E. Clark, clinical psychologist Alan L. Taylor, Ph.D., and urologist Dr. Gerald H. Jordan. DOTD objects that Voogt's plan "necessarily calls for medical expertise or at least confirmation by physicians," and, contends that the record is devoid of medical evidence substantiating the bulk of Voogt's "medical conclusions." DOTD contends that the record establishes only the need for additional reconstructive surgery, some periodic return visits to Dr. Hargroder and "minimal psychological care." DOTD contends that Snearl has established future medical needs which should not exceed $475,000 and has failed to present medical evidence to substantiate Voogt's conclusions.
The comprehensive report prepared by Voogt gives a review of Snearl's various medical conditions as well as a summary of his physical and mental limitations. The information was extracted from medical reports and an interview with Snearl. The physical limitations noted by Voogt include bilateral above-the-knee amputations, multiple scarring from skin grafts and burns, penile implantation with scarring and reconstructive changes, voiding difficulties, daily headaches, increased sweating and heat intolerance, minimal limited ability to bend, reaching and lifting difficulties, confinement to a wheelchair, inability to stand, walk, kneel, jump, stoop, climb, run, play various sports, phantom pain, and sexual dysfunction, as well as significant emotional and psychological changes secondary to his disability issues. Voogt concludes that Snearl's medical course requires continued intervention and monitoring by specialists in orthopedic, plastic and reconstructive surgery, genital urinary reconstructive surgery, urology and physiatry. He further suggests the need for neurological evaluations concerning his headaches and management of his phantom pain. Voogt further opines that Snearl is in need of occupational and physical therapy evaluations and interventions for higher level physical skills attainment, equipment and adaptive skills training. Voogt notes that Snearl will require home modification throughout his lifetime, as well as assistance with home care needs, including lawn care and ordinary home maintenance. Snearl will require a specially modified vehicle for transportation, which would provide some increased independence for him as well as enhancing his self-esteem.
Voogt's report lists a detailed itemization of cost items, which can be categorized into three basic categories:
1) Medical evaluations and treatment which includes the various medical follow-ups expected for Snearl, together *591 with an estimated cost and recommended frequency and duration;
2) Therapeutic evaluations, including referrals for physical, occupational and recreational therapy, vocational evaluation and a one-time driver evaluation; and
3) Treatment programs, including counseling by a psychologist and additional physical, occupational, recreational therapy and lifetime support care.
The report further contains an estimation for the cost of obtaining a handyman, yardman and housekeeper, estimates of purchase cost and maintenance for a specially modified van for the handicapped and an estimate for one-time home modifications and renovations, and needed equipment for physical rehabilitation and mobility, including wheelchairs and safety tub and shower grab bars. Voogt estimated the one-time non-recurring costs for various items to be $107,058. However, the yearly cost of the remaining items was presented in the form of three separate estimates, depending upon whether Snearl would require eight hours, sixteen hours, or twenty-four hours of daily support care. These total yearly costs varied from a low of $55,536 per year to $125,616 per year.
The record also contains testimony from rehabilitation specialist Chalfin and clinical and neuro-psychologist Dr. Robert D. Davis, both of whom saw and evaluated Snearl relative to his limitations and the impact the tragedy has had on his daily life activities. Dr. Lamar B. Jones, professor of economics at Louisiana State University, was received as an expert in the field of economics. In addition to presenting the jury with an estimate of Snearl's loss of future earnings, Dr. Jones created estimates for future life care costs for Snearl. Voogt obtained the cost of the various items described hereinabove and supplied those to Dr. Jones, who in turn projected those costs over Snearl's remaining life expectancy of 47.9 years in order to derive a total estimated cost of future life care. Dr. Jones presented to the jury three different scenarios of total life care costs, with the only variable being the number of hours per day of support care rendered to Snearl. Based upon eight hours daily of support care, Snearl's total life care costs are estimated to be $2.4 million. The estimated cost of sixteen hours of support care is $4.2 million, and, based upon twenty-four hour days of support care, the total estimated life care cost rises to over $5.85 million. A review of the entirety of the record shows that Snearl will more probably than not require some daily support care.
Because we find a reasonable basis in the record to support the jury's award of $3.3 million for future medical expenses and life care plans for Snearl, we cannot conclude that the jury abused its vast discretion. We, therefore, decline to modify the award for future medical costs and life care.

C. Award to Ellouise Stewart
DOTD objects to the $300,000 award to Snearl's mother, Ellouise Stewart, for loss of consortium as a result of Snearl's injuries. Snearl was 22 years old on the date of the accident and 26 years old at the time of trial. As noted earlier, he suffered massive injuries and is now confined to a wheelchair. The award for future medical costs and life care assures that Ms. Stewart will be freed of much of the arduous tasks of daily care of her son. DOTD argues that despite her son's catastrophic injuries, Ms. Stewart still retains her son's affection and society. He is still quite mentally capable; indeed, he shows remarkable resiliency and alertness. He is available to his mother for companionship.
The jurisprudence has held that a loss of consortium claim has seven elements: 1) loss of love and affection; 2) loss of society and companionship; 3) impairment of sexual relations; 4) loss of performance of material services; 5) loss of financial support; 6) loss of aid and assistance; *592 and 7) loss of fidelity. Bell v. USAA Casualty Ins. Co., 30,192, p. 13 (La.App. 2nd Cir.1/21/98), 707 So.2d 102, 110, writs denied, 98-0712 (La.5/8/98), 718 So.2d 433, 98-0766 (La.5/8/98), 718 So.2d 433, 434. A loss of consortium award is a fact-specific determination, to be decided case by case and is disturbed only if there is a clear showing of abuse of discretion. Rudd v. Atlas Processing Refinery, 26,048, p. 18 (La.App. 2nd Cir.9/21/94), 644 So.2d 402, 412, writ denied, 94-2605 (La.12/16/94), 648 So.2d 392.
Elements of a parent's claim for loss of service and society are essentially the same as those for loss of consortium claims, with exception of the sexual component. Rhodes v. State Through DOTD, 94-1758, p. 17 (La.App. 1st Cir.12/20/96), 684 So.2d 1134, 1136, writ not considered, 97-0242 (La.2/7/97), 688 So.2d 487. In the context of a parent/child loss of consortium, the loss suffered by the parent is based on loss of aid, assistance and companionship of the child and loss of affection, society and service. Pino v. Gauthier, 633 So.2d 638, 656 (La.App. 1st Cir.1993), writ denied, 94-0260 (La.3/18/94), 634 So.2d 859.
In brief, Snearl notes that the record amply demonstrates that Ms. Stewart suffered considerable emotional distress from Snearl's tragic accident. Ms. Stewart raised Snearl alone since he was thirteen years old and the two had a very close and loving relationship. She has provided a great deal of home care for Snearl and accompanied him to Virginia when he had his penile reconstructive surgery.
However, the record reflects an absence of testimony that would directly support an award of this magnitude, taking into account the above elements of a loss of consortium, service and society. There is no showing that Snearl provided Ms. Stewart any material support. Nor did her testimony demonstrate any loss of love and affection, fidelity, or society and companionship. We find it likely that the jury made an award of sympathy to Ms. Stewart for her undeniable grief resulting from her son's injuries. We, therefore, reluctantly conclude that the jury abused its vast discretion in making an award of $300,000 to Ms. Stewart for loss of consortium. We must lower the award to the highest permissible amount. In doing so we should review prior awards to discern the appropriate amount.
In Simpson v. State Through DOTD, 636 So.2d 608, 616 (La.App. 1st Cir.1993), we reduced an award for loss of society and services from $50,000 to zero, noting that the parents failed to prove the elements of a loss of consortium by a preponderance of the evidence. There was no showing made of any material dependency upon the injured plaintiff, who likewise lost both legs to amputation following an automobile accident, nor did the parents prove a deprivation of their son's love and affection. We specifically held that the parents are not entitled to recover, under the rubric of loss of consortium, any mental anguish deriving from their son's injuries. Simpson, 636 So.2d at 617.
In Rhodes, 684 So.2d at 1146-47, wherein we reversed the trial court's determination of no liability as against the DOTD and rendered awards de novo, we granted awards of $3,500 and $1,500 to each of two parents of a seventeen-year old high school senior living at home with her parents, who suffered facial and cervical injuries from a motor vehicle accident. The record shows that the mother provided daily care for the daughter for almost two months. Prior to the accident the injured plaintiff provided help for her parents with chores.
In Bergeron v. Blake Drilling & Workover Co., Inc., 599 So.2d 827, 846-47 (La. App. 1st Cir.1992), a jury awarded $500,000 for loss of consortium to the wife of an oilfield employee who suffered severe permanent injuries after an explosion. We reduced that award to $100,000, noting that our award was the "highest award ever" for loss of consortium. In Laing v. American Honda Motor Co., Inc., 628 *593 So.2d 196, 207 (La.App. 2nd Cir.1993), the Second Circuit affirmed this writer's grant of JNOV reducing a jury award of $250,000 to $100,000, for an award of loss of consortium to the wife of an injured plaintiff, although the appellate court was critical of the methodology employed.
Finally, in Pino, 633 So.2d at 656, the trial court granted JNOV, reducing to $150,000 the loss of consortium awards of $250,000 to each of two parents of a nineteen-year old young lady living at home. At the time of the accident, the plaintiff was planning her wedding and the birth of her first child. Noting that the plaintiff had significant behavioral problems, needed 24-hour care supervision, and had poor problem solving and reasoning skills, we concluded that the parents suffered a compensable loss. We held that the JNOV reducing the awards was proper and that there was no abuse of discretion. Accordingly, we found no need to resort to a review of prior cases. See also this court's consortium awards in Doucet v. Champagne, 94-1631 (La.App. 1st Cir.4/7/95), 657 So.2d 92, and Chamberlain v. State Through DOTD, 91-1942 (La.App. 1st Cir.3/11/94), 633 So.2d 871.
Having determined that it was improper to permit an award for mental anguish to Ellouise Stewart for the injuries to her son, and as such the award for loss of consortium to her was excessive, we must reduce the jury's award to the highest amount permissibly given under the prior jurisprudence. We, therefore, find that an award of $125,000 is the highest amount permissible for an award for loss of consortium to Ms. Ellouise Stewart under the record of this case. Ellouise Stewart's award is hereby amended to $125,000.00.

CONCLUSION
For the foregoing reasons, the motion to intervene by National Union is dismissed. The peremptory exception raising the objection of no cause of action by DOTD is denied. The judgment of the trial court finding Benny Frank 10% at fault is reversed, and the percentage of fault attributable to Benny Frank is increased to 35%. The award to Ellouise Stewart is amended to $125,000.00. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed in the amount of $5021.77 to plaintiffs, Jerrod Snearl and Dalton Olinde, and in the amount of $5021.77 to defendant, State of Louisiana, through the Department of Transportation and Development.
MOTION TO INTERVENE DISMISSED; EXCEPTION OF NO CAUSE OF ACTION DENIED; JUDGMENT REVERSED IN PART; AMENDED IN PART; AND AS AMENDED, AFFIRMED; AND RENDERED.
NOTES
[1] Judge Daniel W. LeBlanc, retired, is serving as judge ad hoc by special appointment of the Louisiana Supreme Court. Judge D. Milton Moore, III, of the Fourth Judicial District Court is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Prior to the enactment of 1995 La. Acts Nos. 1328 and 828, La. R.S. 9:2800, which added the requirement of "actual or constructive" knowledge, was an impermissible legislative act limiting the State's liability, and as such, was unconstitutional. Jacobs v. City of Bunkie, 98-2510, p. 6-7 (La.5/18/99), 737 So.2d 14, 19.